**TEXAS INTERNATIONAL AIRLINES, INC., Plaintiff,**

**v.**

**AIR LINE PILOTS ASSOCIATION INTERNATIONAL (ALPA), et al., Defendants.**

**Civ. A. No. H–80–985.**

United States District Court, S. D. Texas, Houston Division.

June 29, 1981.

---

L. Chapman Smith, Baker & Botts, Houston, Tex., for plaintiff.

Bruce A. Fickman, Chris Dixie & Assoc., Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McDONALD, District Judge.

### Introduction

The Original Complaint in this action was filed on May 2, 1980. In summary, plaintiff Texas International Airlines, Inc. (hereinafter referred to as plaintiff or T.I.), a major airline carrier, alleged in the Complaint that the defendant Air Line Pilots Association (hereinafter referred to as defendant or ALPA) and several of its constituent organizational units as well as several named individual defendants and the members of the union were engaging in an unlawful strike or work stoppage in violation of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* Alleging that serious and irreparable injury was threatened by a continuation of such strike, the Complaint sought injunctive relief against further strike activity by the defendants as well as monetary damages.

At the same time the Complaint was filed, plaintiff also submitted a motion that the defendants be temporarily restrained until a hearing could be had upon the plaintiff's application for a preliminary injunction. In the absence of this Court, this motion was heard by the Honorable Carl O. Bue *ex parte* and a temporary restraining order was issued. By this order, entered on May 2, 1980, Judge Bue found that the defendants appeared to be engaging in an unlawful strike under the Railway Labor Act and that plaintiff would suffer irreparable injury if such strike conduct were not restrained pending the hearing upon plaintiff's application for a preliminary injunction. Accordingly, Judge Bue's order restrained all of the defendants, and all other persons acting with them, from the following:

1. Threatening, calling, instigating, authorizing, encouraging, participating in, approving, or continuing a strike or work stoppage against the plaintiff and all acts in furtherance or support thereof.

2. Picketing or bannering the premises on which plaintiff conducts its operations, including the entrances and any other places where said premises are situated; interfering with ingress to or egress from said premises, including the delivery, unloading, load, dispatch and movement of plaintiff's planes and equipment and the contents thereof; or loitering or congregating at or near any approaches thereto, and upon any public street or highway leading to or from any place which employees of plaintiff or those having business with the plaintiff desire to enter or leave enroute to or from said premises.

3. Slowing down or interfering with in anywise or manner the orderly and prompt continuance of work in plaintiff's operations.

4. In any way carrying out or effectuating or conspiring to carry out or effectuate the activities enjoined in subparagraphs 1, 2, and 3.

In addition, the order affirmatively required all of the defendants to take all steps within their power to prevent the occurrence of such a strike or work stoppage.

Judge Bue's order was to expire by its terms within ten days unless extended for a longer period upon good cause shown or unless the defendants agreed to such an extension. The order set down for hearing on May 7, 1980, plaintiff's application for a preliminary injunction.

Prior to the expiration of Judge Bue's order, the parties requested that plaintiff's application for a preliminary injunction be rescheduled to May 29, 1980, and that the temporary restraining order be continued in effect until the conclusion of such hearing. This request was granted by the Court.

On May 28, 1980, the parties again requested a rescheduling of the preliminary injunction hearing and again agreed to continue the temporary restraining order in effect until the conclusion of the hearing. This request was also granted by the Court.

Thereafter, on a monthly basis, the parties requested that the preliminary injunction hearing be rescheduled and that the temporary restraining order be continued until the conclusion of the hearing. On each occasion, the Court granted these requests.

In their joint request for an extension of the temporary restraining order in August, 1980, the parties requested that the temporary restraining order be modified to include additional language providing that the order would expire if the statutory procedures under the Railway Labor Act were exhausted. This request was granted and the temporary restraining order modified to this effect on August 28, 1980.

On September 4, 1980, defendant ALPA and its constituent subdivisions named as defendants as well as the named officials of the union filed their Answer and Counterclaim. This basically denied the substantive allegations set out in the Complaint and presented a counterclaim alleging that plaintiff had breached its statutory obligations under the Railway Labor Act by refusing to implement an alleged new collective bargaining agreement to resolve the labor dispute underlying this action. Plaintiff filed its Answer on September 22, 1980, denying the substantive allegations set out in the Counterclaim.

On October 18, 1980, the May 2, 1980, temporary restraining order, as modified, was in effect pursuant to the Court's October 7, 1980, order granting the most recent application by the parties to continue the series of extensions of this order. On this date, the parties appeared before the Court upon plaintiff's application that the order be modified to specifically prohibit an additional form of unlawful strike activity allegedly being engaged in by the defendants. After reviewing the affidavits submitted by plaintiff and hearing from counsel for the parties, the Court entered on October 18, 1980, an order vacating the May 2, 1980, temporary restraining order and issued a

new temporary restraining order which repeated the prohibitions set out in the May 2, 1980, order and added a prohibition against:

> 5. Taking any form of concerted action, or individual action pursuant to agreement, which would in any respect accomplish the intended result of delaying, disrupting, or interfering with plaintiff's operations including, but not limited to, any use of established procedures to report equipment outages or malfunctions to effect, or attempt to effect, an intended delay, disruption, or interference with plaintiff's operations.

As in the case of the May 2, 1980, order, the October 18, 1980, temporary restraining order was subsequently repeatedly extended upon the joint request of the parties on a monthly basis and the hearing date upon plaintiff's application for a preliminary injunction was repeatedly rescheduled on each occasion to coincide with the expiration of the temporary restraining order.

On October 21, 1980, plaintiff requested that the Court issue an order requiring that defendants appear and show cause why it should not be found in contempt of the October 18 temporary restraining order for failing to utilize to ACARS system. Based upon the affidavits submitted by plaintiff and the parties' arguments on this request, the Court entered a show cause order to this effect on October 21, 1980. Soon thereafter, however, the plaintiff reported to the Court that it had been given assurances by defendants that the alleged contempt of the October 18 order would cease and on October 22, 1980, the Court indefinitely postponed the show cause hearing upon plaintiff's request.

On May 7, 1981, the October 18, 1980, temporary restraining order was still in effect pursuant to the most recent agreement by parties in April to extend the order. On this date, the parties appeared before the Court and defendants reported that plaintiff would agree to no further extensions of the temporary restraining order or to any further rescheduling of the hearing upon plaintiff's application for a preliminary injunction which was then scheduled to begin on the following day, May 8. Based upon defendants' representations of the unavailability of their counsel to attend this hearing, the Court granted on this date the defendants' application to postpone the preliminary injunction hearing to May 26, 1981. The Court also extended at this time the temporary restraining order until the conclusion of this hearing and further ordered that defendants appear at the May 26 hearing and show cause why they should not be found in contempt of the temporary restraining order.

Following the May 7 orders by the Court the parties conducted extensive discovery in preparation for the May 26 hearing. However, defendants again requested, and the Court granted, a further postponement of the contempt and preliminary injunction hearing until June 1, 1980. At this time plaintiff formally applied for a show cause hearing upon its contempt application and the Court entered a formal show cause order directing defendant ALPA to appear and show cause why it should not be found in contempt of the October 18, 1980, temporary restraining order.

On June 1, 1981, the hearing commenced upon plaintiff's applications to find defendant ALPA in contempt and to obtain a preliminary injunction and upon defendants' request that the Court vacate the temporary restraining order.

On June 11, 1981 the plaintiff filed an Amended Complaint which was unopposed by the defendant. In the Amended Complaint the plaintiff reurges the allegations contained in the Original Complaint. In addition, the plaintiffs specifically complained that ALPA had engaged in various schemes and stratagems intended to slowdown or disrupt T.I.'s normal operations. These stratagems included concerted efforts to: 1) call in sick; 2) report excessive equipment malfunction reports; 3) report equipment malfunctions at non-maintenance stations; 4) report equipment malfunctions in such a way as to delay T.I. flights; 5) waste fuel and; 6) refuse to utilize or properly utilize plaintiff's ACARS system. The defendants filed their Answer to the Amend-

ed Complaint and Counterclaim on June 16, 1981.

At the close of the plaintiff's case, defendant ALPA made an oral motion to dismiss under Rule 41 of the Federal Rules of Civil Procedure. The defendant's motion requested this Court to dismiss the plaintiff's application to hold ALPA in contempt, to vacate the Court's October 18, 1981 temporary restraining order and to adjourn the hearing on plaintiff's motion for a preliminary injunction. The Court denied defendant's motion except with respect to finding that the plaintiff failed to adduce clear and convincing evidence that defendant ALPA had violated the Court's temporary restraining order under a "mass action" theory of contempt liability. The Court indicated that the denial of defendants' motion was without prejudice and that the defendant could reurge its motion at the close of the hearing.

The Court heard eleven days of testimony extending over a three-week period from a large number of witnesses and received many exhibits offered by the parties. Memoranda of authorities were submitted by the parties on several points raised during the course of the proceedings and extensive briefs and proposed findings were submitted by the parties at the conclusion of the hearing. Based upon the evidence presented at the hearing, the Court hereby renders its Findings of Fact and Conclusions of Law upon plaintiff's application for a preliminary injunction, plaintiff's application that defendant ALPA be found in contempt, and defendant's application to vacate the temporary restraining order.

## FINDINGS OF FACT

### I. General Background

1. Defendant Air Line Pilots Association, International, (hereinafter ALPA) is an unincorporated association organized for the purposes and objectives of a labor organization.

2. Defendant ALPA is a "representative", as defined in Section 1, Sixth of the Railway Labor Act, 45 U.S.C. § 151, Sixth.

3. Plaintiff Texas International Airline, Inc., (hereinafter referred to as Texas International), is a "common carrier by air engaged in interstate or foreign commerce," as defined and used in Section 201 of the Railway Labor Act, 45 U.S.C. § 181, and is subject to the provisions of the Railway Labor Act.

4. Defendant ALPA is the duly authorized and recognized collective bargaining representative under the Railway Labor Act for all airline pilots employed by plaintiff Texas International.

5. At all times relevant herein, defendant ALPA has been represented by the duly authorized and elected officials of Council 85. At all times relevant herein, these officials have been Dennis Higgins, Floyd Carpenter, J. M. Wood, and A. L. Waldo.

6. Pursuant to their obligations under the Railway Labor Act, the parties have bargained on numerous occasions in the past and have entered into a series of collective bargaining agreements. The most recent such agreement expired on February 1, 1980. (Plaintiff's Exhibit No. 1) Pursuant to the requirements of the Railway Labor Act, however, the parties were obligated to, and have, continued to observe the terms of this agreement pending exhaustion of the Act's procedures which govern the bargaining process. 45 U.S.C. § 155.

### II. Underlying Labor Dispute

7. As is customary for the parties, negotiations began upon the terms for a new collective bargaining agreement in late 1979 and continued into 1980 up to, and beyond, the expiration of the old agreement on February 1, 1980. When no agreement could be reached by the parties, a mediator was requested from the National Mediation Board pursuant to the procedures of the Railway Labor Act.

8. On June 9, 1980, the parties initialed and tentatively agreed to the outstanding items which were needed to form a new collective bargaining agreement except for the Labor Protection Provision or "LPP's". (Defendant's Exhibit 30) Although both parties apparently regarded this as an item

of major significance, the parties agreed that their respective attorneys would meet to attempt to negotiate the terms of the LPP's. No agreement was ever reached on the terms for LPP's.

9. Subsequent to June 9, 1980, plaintiff proposed certain changes be made to some of the terms which the parties had agreed on June 9 for the asserted purpose of meeting increased competition by Southwest Airlines. These changes were to be included in a final agreement. Defendant ALPA insisted that a new collective bargaining agreement be signed before such discussions be had. Plaintiff, on the other hand, apparently insisted that the parties should discuss such changes and incorporate them into any new agreement.

10. Plaintiff on or about July 30, 1980 apparently withdrew its proposal (or counter proposal) on LPP's and defendant ALPA subsequently withdrew its LPP proposal. In the view of defendant ALPA, at this point plaintiff was bound to execute a formal agreement based on the June 9 terms since the only subject not agreed to on June 9—LPP's—was no longer an issue. Plaintiff, on the other hand, believes that, since there had been no final agreement on all material items to be incorporated in a new collective bargaining agreement, it was entitled to respond to changed circumstances in the industry by proposing changes in the terms of a not-yet-final agreement.

11. Both parties have maintained their respective positions to the present day. Because the question of whether plaintiff must accept the June 9 terms without change is the subject of defendants' Counterclaim and because no decision is required to be made on this issue at this time, the Court will not comment upon the validity of defendant's position beyond that necessary to respond to defendants' contention that plaintiff's position in this regard is indicative of bad faith bargaining under the Railway Labor Act, 45 U.S.C. § 152, and the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq.* and therefore prohibits the issuance of a preliminary injunction. The evidence regarding the parties negotiations before the

National Mediation Board is somewhat scanty. However, it is clear after negotiating in April of 1980 for about one week, defendant ALPA applied for mediation. Plaintiff and defendant met with the federal mediator. Sometime shortly after July 30, 1980 the defendant asked for a release from the Board, and a proffer of arbitration. (See Railway Labor Act, 45 U.S.C. § 155) Two weeks later defendant asked that this request be held in abeyance. Since July 30, 1980, the parties have not had a meeting of any consequence to discuss contract negotiations until the first part of this year. It appears that the parties are in a stand off; defendant ALPA asserting that a new contract was reached on June 9, 1980 and therefore, there is nothing to discuss and plaintiff taking the position that no final agreement was reached on a new contract. The Court finds in this regard that, whatever the ultimate determination which is made upon defendants' Counterclaim, the position of neither party can be said to be patently unreasonable. Without intending to intimate a view as to whether a different result might not be ultimately appropriate under the Railway Labor Act and the facts of this case as later developed, based on the state of the record now before the Court, the Court finds that plaintiff's position does not constitute bad faith bargaining so as to preclude it from obtaining a preliminary injunction in this action.

12. As outlined above, the parties do have differences with respect to their contract negotiations. As a result of these differences, there have been problems with respect to the job performance by plaintiff's pilots represented by defendant ALPA. In plaintiff's view, these problems have been the result of a concerted effort by defendant ALPA to conduct a slowdown or disruption of its operations. In the view of defendant ALPA, however, it is bad morale because of the status of the contract negotiations and lack of desire to help plaintiff on the part of the pilots which has created any problems which plaintiff has had and these are things which have nothing to do with defendant ALPA and certainly do not indi-

cate a concerted slowdown organized by the union.

### III. Background of Actions Taken Prior to the May 2, 1980, Temporary Restraining Order

13. With respect to the plaintiff's application to hold defendant ALPA in contempt the only order of this Court of which ALPA may be charged with contempt is the October 18, 1980 temporary restraining order, which was subsequently extended by agreement.

14. The events which happened prior to the issuance of the May 2, 1980 temporary restraining order, however, are relevant both for purposes of evaluating the propriety of a preliminary injunction and of understanding the implication of later events.

15. In the late 1960's, also during negotiations for a new contract between the parties, several witnesses testified that defendant ALPA had utilized what was known as a "withdrawal of enthusiasm" or "WOE" campaign. This was apparently a tactic by which members of defendant ALPA were encouraged by the union to refuse to willingly cooperate with plaintiff in its attempts to conduct efficient operations. Because all witnesses who testified on the point agreed that pilots have—and must have if they are to properly perform their duties—a wide range of discretion, this tactic was apparently utilized as a means to exert pressure on T.I. to agree to ALPA's bargaining proposals.

16. The significance of a February 21, 1980 letter by Dennis Higgins (Chairman of the subdivision of defendant ALPA known as Council 85 which is the organizational unit consisting of ALPA members employed by plaintiff) should be evaluated in light of the prior WOE campaign discussed above. This letter, Plaintiff's Exhibit No. 9, was mailed to all members of Council 85 by Mr. Higgins almost three weeks after the old collective bargaining agreement had expired and was referenced to the contract expiration date. The letter expressed concern about a "degeneration of pilot morale due to the delays in negotiations", and urged the pilots to "be professional" and

maintain their "standards of operation". The letter also advised pilots to: "adhere to company policies, and contractual agreements"; "not neglect even the most minor write ups"; "not start engines until all doors are closed, and paperwork is on board, and checked for accuracy," and to check every item on the checklists used by pilots prior to departure and arrival.

17. A "write up" is a procedure under which pilots enter into a log all equipment malfunctions. These reports are required to be made by FAA regulations and are required to be investigated by maintenance employees and either repaired or certified as safe to fly with before flight operations can continue. Although all such mechanical problems must be reported as they are identified by pilots, there necessarily exists a high degree of discretion with the individual pilot as to such determinations, for example, as whether a particular knob on the control panel is sticking or a particular lighted dial is dim to the point of needing a new light bulb. The number of write ups, their timing and the location at which they are submitted can have a substantial impact on delays in flight operations.

18. Although Mr. Higgins denied in his testimony, any intent that his letter be interpreted as a request to pilots that they engage in a slowdown, he admitted that it was seen as such by plaintiff's management and that, as a result of plaintiff's refusal to continue negotiations while this letter was outstanding, he agreed to retract the letter. Based on his assurances in this regard, the negotiations continued.

19. The express direction of Mr. Higgins' letter that pilots not neglect "even the most minor write up" was indeed followed by an increase in write ups. (Plaintiff's Exhibit No. 2 and Defendants' Exhibit No. 105) The Court has concluded from these circumstances, and from the timing of the letter in relation to the contract expiration, the reference in the letter itself to such date, the allegation in the letter of poor pilot morale due to delays in negotiations, and Mr. Higgins' demeanor that this letter was sent by Mr. Higgins with the under-

standing that many of the union members would interpret the letter as a direction to slowdown or delay T.I.'s operations. The Court concludes that this was done to bring pressure on the plaintiff to agree to defendants' contract proposals.

20. The Court's conclusion with respect to the purpose of the February 21 letter is strengthened by Mr. Higgins' response to plaintiff's objections to such letter. Although he admitted to having agreed to retract the letter in response to plaintiff's objections, Mr. Higgins testified that his "retraction" consisted of statements made at one or more monthly membership meetings of Council 85 that the letter should not be viewed as a slowdown invitation. Unfortunately, the minutes of the union meetings do not reflect that such an instruction was ever made. Since the Secretary-Treasurer of the union, Captain Waldo, testified that all matters of significance discussed at meetings are summarized in the minutes, the implication of the failure of the minutes to reflect any kind of retraction of Mr. Higgins' February 21 letter is that either no such retraction was in fact made or that, if it was, it was not done in such a way as to cause the union's Secretary-Treasurer to regard it as a matter of any importance. Most importantly, the failure of the minutes to reflect any such retraction means that the three-fourths of the union's membership, who the evidence indicated do not attend any one meeting and must depend on copies of the minutes mailed to their homes to tell them of the events at the meeting, had no way to know of the retraction even had it been made.

21. The evidence reflected that defendant ALPA had a variety of ways to pass along information to its members. Thus, the union has available to it, and has used: 1) meetings of the membership held approximately monthly during this time period, 2) minutes of the meetings which were mailed to all members, 3) a telephone codaphone on which 100–150 different messages were placed by the union since January, 1980, 4) a telephone committee with a number of union members each assigned a number of other members to contact by telephone when instructed to pass on a message from the union's leadership, 5) bulletin boards in the pilots' crew rooms at which pilots assemble before flights, and 6) letters mailed to each pilot's home. Although Mr. Higgins selected the one method most likely to be widely received by the membership in sending out his February 21, 1980, letter, he picked the method which is apparently the least likely to reach large numbers of members to disseminate his alleged retraction of this letter.

## IV.  The Sick Out

22. Mr. Don Johns testified to having been the chairman of the union's telephone committee in late April and early May, 1980. The Court finds that on the last day of April or the first day of May, 1980, Mr. Johns directed his committee to send out to the union members, on instructions from an unidentified union official, a message to the effect that if pilots did not feel well, they should not fly. The members' receipt of this message was followed immediately by an extremely large increase in the number of pilots reported off sick from work.

23. In spite of acknowledging that "sick out" suggestions had been made at one or more union meetings, by union members, Mr. Higgins denied that the message sent out by the telephone committee was intended to result in a "sick out" or that the union's officials were aware of this possibility. The Court cannot accept this claim. On its face the unexplained message from the union leadership that pilots who feel ill should not fly can naturally be expected to result in a significant increase in reports of sickness by pilots. If enough pilots understood this to be the purpose of the message to cause cancellation of 90% of plaintiff's Houston flights, Mr. Higgins' claim to have been entirely unaware of this potential when the message was authorized lacks all basis for belief. The Court must conclude that Mr. Higgins' testimony in this regard was less than entirely candid.

24. The Court cannot accept Mr. Higgins' testimony that the telephone message was merely a response to company com-

plaints in late January or early February that certain pilots were abusing their sick leave.

25. The Court has concluded that plaintiff has shown that the May, 1980, sick out was a deliberate attempt by defendant ALPA to disrupt plaintiff's operations as a means to pressure plaintiff into accepting the union's bargaining proposals. The Court cannot believe the denial by the union's officers of culpability in this regard and such denial seriously detracts from their credibility in denying union involvement in later problems.

## V. Plaintiff's Application for a Preliminary Injunction

26. The transmittal by Mr. Higgins of the February 21, 1980, slowdown letter and the organization of the May sick out are events which cannot, of themselves, form the basis for a contempt finding or preliminary injunction as both occurred prior to the May 2, 1980, temporary restraining order. These events do, however, define the scope of the union's duty after May 2, 1980, to utilize effective measures to ensure that slowdowns and disruptions did not continue. The sick out provides the union with historical evidence that a significant number of pilots were prepared to take concerted action that resulted in a disruption of plaintiff's operations as an expression of their dissatisfaction with the plaintiff's position on contract negotiations and as a tool to force the plaintiff to accede to the defendants' demands.

27. An examination of Plaintiff's Exhibit 2 reflects that, for the one year period from May, 1979, through May, 1980, the rate at which write ups were turned in reached a low point in December, 1979 and a high point in May, 1980. The overall pattern of such write ups from May, 1979–May 19, 1980 shows a striking tendency to decrease in the months immediately following the May, 1980, temporary restraining order, and the October, 1980, temporary restraining order. In addition, the exhibit indicates that the rate of write ups also dropped off from the level experienced in April, 1981, after this case was set for a contempt hearing in early May, 1981.

28. Although not all write ups are turned in by pilots, by far the majority of such write ups are attributable to pilots; this was not disputed by the defendants. In light of this fact and the data contained in Plaintiff's Exhibit No. 2 the Court is persuaded that a large number of pilots have, in fact, exercised their discretion to increase or decrease the rate at which they submit write ups.

29. Plaintiff's evidence is persuasive, and the Court so finds, that a significant number of pilots have been intentionally delaying operations by equipment write ups, in order to exert pressure on T.I. to agree to defendant ALPA's contract proposals. Plaintiff's Vice President for Operations testified that the increase in write ups alone (Plaintiff's Exhibit 2) was caused by the actions of 40–50 pilots. The Court finds particularly persuasive in this regard the following evidence:

a) Plaintiff's Exhibit 2 reflecting a significant increase in the rate at which write ups have been turned in and the response of the rate of such write ups to the actions of this Court;

b) Plaintiff's Exhibit 3 showing an extremely sharp rise in write ups turned in in April, 1981, immediately before flight departures and the sharp drop in May, 1981, after the Court set this case down for a contempt hearing;

c) Plaintiff's Exhibit 4 showing a significant increase since November, 1980, in write ups turned in at stations at which plaintiff does not maintain maintenance facilities;

d) the testimony of several members of defendant ALPA to the effect that other pilots had admitted to them to having taken actions to disrupt or delay operations;

e) the testimony of two of plaintiff's station agents describing their personal observations of how the write up campaign has been conducted by pilots; and

f) the testimony of an official of the FAA describing the problems that agency has had recently which were caused by delaying tactics utilized by plaintiff's pilots.

30. The plaintiff's Amended Complaint alleged that ALPA pilots refused to utilize or to properly utilize the plaintiff's navigation and control system known as the ACARS system. It was undisputed at the hearing that in the fall of 1980 ALPA pilots refused to utilize the ACARS system. However, after the pilots learned that the October 18, 1980 temporary restraining order required them to operate ACARS they did so. The plaintiff did not present any evidence or arguments, at the hearing, suggesting that continued injunctive relief is required in this regard. The plaintiffs, however will have an opportunity to reurge this complaint at the trial on the merits.

31. The plaintiffs argued that ALPA pilots were engaged in a concerted effort to increase fuel usage in order to make plaintiff's flight operations more expensive. Plaintiff's Exhibits 34 and 35 lent some support to that claim. Mr. Rife's testimony in support of those exhibits, however, was inadequate. Defendants' Exhibits No. 111, 114, 117 and 119 suggested that there was virtually no correlation between increases in fuel usage and this Court's orders directed at the ALPA pilots. At this time, the record on fuel utilization is confusing, therefore the Court is unable to frame an appropriate injunctive order on this specific complaint. The plaintiff will be able to present additional evidence on this issue at the trial on the merits.

32. The testimony of Mr. Higgins and Mr. Don Johns clearly established that in and about May 1980, defendant ALPA, its officials and members, engaged in a "sick out." The Court, however, does not find that Plaintiff's Exhibits 7, 39, 40 and 41 support a finding that the defendants have continued to threaten any strike or "sick out" or have significantly increased the use of sick leave.

33. The Court, for the most part, rejects the arguments of the defendant ALPA regarding the evidence (or lack thereof) of concerted efforts on the part of pilots to disrupt plaintiff's operations. The Court is persuaded that given the tremendous amount of discretion pilots can exercise in the manner in which they conduct a flight operation, the plaintiff's evidence demonstrates that pilots have been exercising their discretion in order to slowdown or disrupt plaintiff's operations. Defendants' Exhibits 90, 99, 100 and 105 do not compel a different conclusion.

34. Concerted action has been taken by pilots to engage in conduct for the purpose of disrupting the operations of the plaintiff and forcing it to accede to the defendants' contract demands. (See Findings 19 through 29)

35. The defendants' protestations of lack of knowledge of these actions are rejected as being totally without candor. Its denial of lack of advance knowledge of the uncontroverted sick out in May of 1980 is equally unplausible and colors its "hear no evil" response to the plaintiff's evidence of tactics of delay by pilots that tracks the entry of orders of the Court.

36. The variety of such tactics shows a pattern of continuing efforts by members of defendant ALPA to effect a slowdown and establishes a likelihood of ultimate success in obtaining a permanent injunction to prohibit all such slowdown efforts. The pattern of these "brush fires" convinces the Court that it need not and should not await a full scale "forest fire" before preliminarily enjoining the defendant.

37. The increase in write ups generally and their timing, e. g., those that cause a delay in departure or return (Plaintiff's Exhibits 3 & 4) have not been done for safety reasons but to coerce the plaintiff to adopt the defendant's contract proposals. If as defendant argues they reflect a general concern about safety, the evidence would have established a continual increase since 1979 and not the peaks and valleys that correspond to orders of this Court; interest in safety (thus write ups) should have no correlation with the latter.

38. The raw number of occurrences that is the data for the showing of this pattern, may or may not be small in number. This Court must accept the position of the plaintiff, that a certain level of occurrences cause disruptions, in the absence of evi-

dence to the contrary. In so far as the Court has found that certain actions were taken for the intended purpose and effect of causing disruptions it has accepted the plaintiff's evidence. In so far as it has rejected the claims of plaintiff as to certain types of action, it has accepted the evidence offered by defendant ALPA.

39. Certainly the harm to be suffered by the plaintiff in the absence of preliminary relief is both serious and irreparable. Loss of good will that would most definitely follow delays and cancellations, e.g., May 1980 sick out cannot be even measured and definitely is not compensable by an award of damages.

40. The defendant ALPA cannot be said to suffer any damage if it is enjoined from engaging in unlawful activity; but certainly the damage to the plaintiff if an injunction is not granted greatly exceeds whatever damage the defendant could assert.

41. The interest of the public is served by enjoining any and all actions that would have the effect of impeding their right to travel and expectation of timely travel.

VI. Plaintiff's Application for Contempt

42. The plaintiff has requested this Court to adjudge defendant ALPA in contempt of the October 18, 1980 Temporary Restraining Order.[1] The defendants, however, contend that the Court's order of October 18, 1980 exceeded the Court's limited jurisdiction to issue an injunction under the Norris-LaGuardia Act and therefore should be vacated. For the reasons set forth in the Conclusions of Law, the Court cannot agree with the defendants' position; the October 18, 1980 temporary restraining order will not be vacated.

43. Under the October 18, 1980 temporary restraining order the officials of defendant ALPA were enjoined, *inter alia*, from:

> threatening, calling, instigating, authorizing, encouraging, participating in, approving, or continuing a strike or work stoppage . . . and all acts in futherance or support thereof; . . .

> slowing down or interfering with in anywise or manner the orderly and prompt continuance of work . . .

> taking any form of concerted action, or individual action pursuant to agreement, which would in any respect accomplish the intended result of delaying, disrupting or interfering with plaintiff's operations . . .

44. In addition the October temporary restraining order enjoined the ALPA officials "to take all steps within their power to prevent the occurrence of such a strike or work stoppage."

45. Both the language and the clear intent of the October 18, 1980 temporary restraining order was to enjoin all the defendants from engaging in any activities intended to disrupt plaintiff's operations, prior to the complete exhaustion of the negotiation and mediation procedures required by the Railway Labor Act.

46. At the very least the October 18, 1980 Order required the officers of defendant ALPA to take the necessary affirmative steps to ensure that member-pilots did not violate the Court's order.

47. The Court's determination that members of defendant ALPA have engaged in conduct intended to slowdown or disrupt plaintiff's operations is not sufficient to establish the union's contempt unless such a substantial percentage of the union's members have been involved so as to satisfy the "mass action" concept.

48. The plaintiff has failed to establish by clear and convincing evidence that the percentage of pilots involved in disruptive actions has been sufficient to satisfy the criteria for the "mass action" theory of union liability.

49. The liability of defendant ALPA for contempt may also be established by the actions of ALPA officers in encouraging its

---

1. The plaintiff has argued that the defendant may be held in contempt of both the May 2, 1980 temporary restraining order and the October 18, 1980 temporary restraining order. The May 2, 1980 Order, was dissolved upon the issuance of the October 18, 1980 Order. The defendant therefore can only be held in contempt of the later Order.

members to violate the Court's order. The plaintiff has failed to produce any clear and convincing evidence of such encouragement.

50. The liability of defendant ALPA for contempt may be established by the inaction of ALPA officers under circumstances in which such inaction can be held to have condoned or ratified the conduct of ALPA members. In this regard the October 18, 1980 temporary restraining order specifically enjoined ALPA officials to take affirmative action to prevent violations of the Court's order.

51. The Court finds that the plaintiff produced persuasive evidence of ALPA officials' failure to take appropriate affirmative steps, under the circumstances of this dispute to ensure that member-pilots did not violate the Court's temporary restraining order. The evidence however was not sufficient under the "clear and convincing" standard applicable to contempt proceedings.

52. The Court finds therefore that the plaintiff has failed to establish by clear and convincing evidence that defendant ALPA is in contempt of this Court's October 18, 1980 temporary restraining order.

## CONCLUSIONS OF LAW

1. Any above listed Finding of Fact which should more properly be listed as a Conclusion of Law is hereby adopted as a Conclusion of Law. Any below listed Conclusion of Law which should more properly be listed as a Finding of Fact is hereby adopted as a Finding of Fact.

2. This Court has jurisdiction over the subject matter and the parties of this action under the provisions of the Railway Labor Act, 45 U.S.C. §§ 151 et seq.

3. There are two kinds of disputes that can properly arise under the Railway Labor Act: "minor" disputes over the interpretation and application of existing collective bargaining agreements between carriers and unions, and "major" disputes over proposals to change such agreements as to rates of pay, rules, or working conditions of employees. Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 722–725, 65 S.Ct. 1282, 1289, 89 L.Ed.2d 1886 (1945).

4. In this action, the plaintiff and defendants are entangled in a "major" dispute arising out of negotiations for a new collective bargaining agreement.

5. Under the Railway Labor Act, parties in a major dispute have a statutory duty to fully exhaust statutorily mandated notice and mediation procedures before resorting to self-help measures such as a strike or work slowdown. Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378–380, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969); Railway Clerks v. Florida E.C. R. Co., 384 U.S. 238, 244, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966). E. g., Detroit & T.S.L.R. Co. v. Transportation Union, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969); Atlanta and West Point R. Co. v. United Transportation Union, 439 F.2d 73, 78 (5th Cir. 1971); Long Island Rail Road Company v. System Federation No. 156, 368 F.2d 50 (2nd Cir. 1966); American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l., 169 F.Supp. 777, 787–788 (S.D.N.Y.1958).

6. Federal Courts may issue injunctions to enjoin compliance with mandates of the Railway Labor Act. Chicago & Northwestern Ry. Co. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); International Association of Machinists v. Street, 367 U.S. 740, 772–773, 81 S.Ct. 1784, 1801, 6 L.Ed.2d 1141 (1961). See also cases cited in Conclusion No. 5.

7. Generally, the required elements to justify the issuance of a preliminary injunction are: 1) a substantial likelihood of success on the merits; 2) serious or irreparable injury in the absence of preliminary relief; 3) greater harm in the absence of preliminary relief than would be suffered by the opposing party if such relief is granted, and 4) the better service to the public interest. See generally Moore's Federal Practice ¶ 65.04[1], et seq. As further set out below, the facts of this case and the applicable standards of law dictate the issuance of a preliminary injunction. Plain-

tiff's Application for a Preliminary Injunction is GRANTED.

8. The defendants contend that in an action for a preliminary injunction in a labor dispute it is not enough that plaintiff shows a "probability of success" on the merits. The defendants contend that the Norris-LaGuardia Act, 29 U.S.C. § 107, dictates that the appropriate standard is "clear and convincing" evidence or a "clear preponderance" of evidence. *See: Chicago, R.I. & P.R.R. v. Switchmen's Union,* 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962).

9. The defendants have failed to cite and the Court's research has failed to reveal any cases which directly support the defendants' argument. The authority relied upon by the defendants is not persuasive. In the *Switchmen's* case, the Second Circuit Court of Appeals was not called upon to reconcile § 7(a) of the Norris-LaGuardia Act (29 U.S.C. § 107(a)) with the "likelihood of success" standard or with the policies of the Railway Labor Act.[2] The Court merely held that when disputants exhaust the mediation procedures required under the Railway Labor Act, a party seeking an injunction must clearly establish that an exception exists to the Norris-LaGuardia prohibition against enjoining peaceful strikes. 29 U.S.C. § 104. The Court stated that it is insufficient to merely establish the substantial likelihood of such an exception.

■ 10. It is well settled however, that when parties, governed by the Railway Labor Act, have failed to exhaust proscribed mediation procedures, the federal courts have authority to issue injunctions pending

compliance with these procedures. *United Industrial Workers of Seafarers Int'l v. Board of Trustees of Galveston Wharves,* 400 F.2d 320 (5th Cir. 1968), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). (Also see cases cited in Conclusion No. 5, *supra.*)

■ 11. Here, it is undisputed that plaintiff and defendants have not fully exhausted required mediation procedures. It is clearly established, therefore, that under these circumstances the Norris-LaGuardia prohibition against enjoining peaceful strikes is subject to an exception.

12. Moreover, Courts have repeatedly applied the "likelihood of success" standard in preliminary injunction actions under the Railway Labor Act. *E. g., Piedmont Aviation, Inc. v. Air Line Pilots Association,* 416 F.2d 633, 637 (4th Cir. 1969); *Flight Engineers Int'l Ass'n v. American Airlines, Inc.,* 303 F.2d 5, 11 (5th Cir. 1962); *Railroad Yardmasters v. Pennsylvania Railroad Co.,* 224 F.2d 226, 229 (3rd Cir. 1955); *American Airlines Inc. v. Air Line Pilots Ass'n, International,* 169 F.Supp. at 795.

■ 13. It is wholly consistent with the objectives of the Railway Labor Act that, in a preliminary injunction proceeding, once it is established that the mandatory negotiation process has not been fully exhausted, a party seeking an injunction must demonstrate a substantial likelihood of prevailing on the merits. To require more would severely emasculate the federal court's established authority to maintain the *status quo* until statutory mediation procedures have

---

2. The Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, expresses a basic policy against the injunctions of activities of labor unions. The Railway Labor Act on the other hand provides a detailed process to facilitate the voluntary settlement of major disputes. The Supreme Court has recognized a duty to reconcile the policies underlying the Norris-LaGuardia Act with those underlying the Railway Labor Act. *E. g., Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R..,* 353 U.S. 30, 40–42, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). The Supreme Court has held that district courts have the power to enjoin strikes notwithstanding the provisions of Norris-LaGuardia when such injunctions are necessary "to vindicate the

processes of the Railway Labor Act." *Id.; Chicago & Northwestern Ry. Co. v. United Transportation Union,* 402 U.S. 570, 581–583, 91 S.Ct. 1731, 1737, 29 L.Ed.2d 187 (1971). In *Virginian Railway Co. v. System Federation,* 300 U.S. 515, 563, 57 S.Ct. 592, 606, 81 L.Ed. 789 (1937), which upheld the issuance of a mandatory injunction, the Supreme Court indicated that in the event of irreconcilable conflict between the policies of the, earlier enacted, general provisions of the Norris-LaGuardia Act and those of the subsequently enacted, more specific provisions of the Railway Labor Act, the latter would prevail under the principles of statutory construction.

been exhausted. *Atlanta & West Point R. Co., supra,* 439 F.2d at 78.

14. This Court has ample authority to enjoin these defendants from engaging in any actions which have the intended effect of delaying or disrupting plaintiff's flight operations and the facts clearly warrant such an injunction. *Long Island Rail Road Company v. System Federation No. 156,* 368 F.2d 50 (2nd Cir. 1966).

■ 15. Disobedience to the October 18, 1980 temporary restraining order, by defendant ALPA, was required to be shown by clear and convincing evidence. *A.H. Robins Co. v. Fadely,* 299 F.2d 557, 559 (5th Cir. 1962).

16. The defendants contend that they cannot be adjudged in contempt of the October temporary restraining order, because that order should be vacated. The defendants argue that the October 18, 1980 temporary restraining order should be vacated on the grounds that the TRO enjoined acts not specifically alleged in plaintiff's original complaint. The defendant insists that the strict procedures required for the issuance of an injunction under Section 9 of the Norris-LaGuardia Act (29 U.S.C. § 109) should be applicable for an injunction under the Railway Labor Act. In short, the defendants argue that the Court's Order of October 18, 1980 exceeded this Court's limited jurisdiction to issue a labor dispute injunction under the Norris-LaGuardia Act. Such an argument is inconsistent with the purposes and objectives of the Railway Labor Act and is not supported by any dispositive case law.[3]

17. The plaintiff's Original Complaint alleged that the defendants had resorted to self-help efforts prior to exhausting the mediation procedures required by the Railway Labor Act. The plaintiff's motion requesting the October 18, 1980 temporary restraining order and the affidavits submitted in support thereof, complained of the same

illegality; only the methods used by the defendants to violate the Railway Labor Act had changed. Application of § 9 of the Norris-LaGuardia Act under these circumstances would not be a reconciliation between that act and the Railway Labor Act. Instead, it would reduce the injunctive relief available under the latter, to a nullity. Cf: *Atlanta & West Point R. Co. v. United Transportation Union,* 439 U.S. 73, 80 (5th Cir. 1971). Such a result is impermissible under controlling law. *Virginian Railway Co. v. Systems Federation,* 300 U.S. 515, 563, 57 S.Ct. 592, 606, 81 L.Ed. 789 (1937).

18. As it has been previously stated, the purpose of injunctive relief under the Railway Labor Act is to prevent the parties in a labor dispute from resorting to self-help and disrupting the *status quo* prior to the exhaustion of mandatory mediation efforts. Therefore, the policy of the Railway Labor Act, i.e. to prevent interruptions of common carrier service by proscribing detailed procedures for the peaceful settlement of labor disputes, may be vindicated with a court injunction. *Railway Clerks v. Florida E.C.R. Co.,* 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966). *American Airlines, Inc. v. Air Line Pilots Ass'n, International,* 169 F.Supp. 777, 787–788 (S.D.N.Y. 1958).

■ 19. The policy of the Norris-LaGuardia Act, on the other hand, is to prohibit federal courts from attempting to regulate labor-management strife by the means of an injunction. *See* Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381 (1960). Consequently, courts have narrowly construed restraining orders and injunctions issued in labor disputes governed by the Norris-LaGuardia Act. *See: Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *New York Telephone Co. v. Communications Workers of America,* 445 F.2d 39 (2nd Cir. 1971).

---

**3.** In *Virginian Ry. Co. v. System Federation No. 40,* 300 U.S. 515, 563, 57 S.Ct. 592, 606, 81 L.Ed. 789 (1937) the Supreme Court indicated that the thrust of 29 U.S.C. § 109, was to prohibit blanket injunctions. Here, the temporary restraining order was not a blanket injunction and it was based upon findings adduced from the verified complaint, affidavits, the plaintiff's written motion and arguments of counsel for both parties.

■ 20. Again, it is well settled that injunctions issued to enforce obligations of the Railway Labor Act are to be accommodated with the Norris-LaGuardia Act only to the extent that the policies of the latter are not inconsistent with the policies of the former. *Virginian Ry., supra.*

21. Since injunctive relief is often necessary to compel disputing parties to adhere to the mediation procedures of the Railway Labor Act, it is the opinion of this Court, that § 9 of the Norris-LaGuardia Act (29 U.S.C. § 109) must yield to the Railway Labor Act which authorizes injunctions to avert threatened interference with mandated mediation procedures.

■ 22. The defendants also contend that the October 18, 1980 temporary restraining order should be vacated because it was issued without a hearing and without affording the defendants an opportunity to present testimony or rebuttal affidavits. This argument must also fail. The defendants' counsel was present and given every opportunity to present arguments when the October 18, TRO was issued. However, neither on that date or anytime subsequent did the defendants request a hearing or raise any objection whatsoever to the procedure under which the TRO was issued. Moreover, the defendants continued to agree to the extension of the TRO without ever even requesting to submit rebuttal affidavits or present oral testimony. In light of these circumstances, the defendants' eleventh hour objections cannot be sustained. *See Railway Express Agency v. BRAC,* 437 F.3d 388 (5th Cir. 1971). In addition, it is not clear that either the Railway Labor Act or the Norris-LaGuardia Act require a full hearing prior to the issuance of every injunction. *See: Missouri-Kansas-Texas R.R. Co. v. Brotherhood of Locomotive Engineers,* 266 F.2d 335 (5th Cir. 1959), *rev'd on other grounds,* 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960). *See also: Squillacole v. Graphic Arts Int'l Union,* 540 F.2d 853 (7th Cir. 1976); *Drywall Tapers & Painters Local 1974 v. Operative Plasterers' and Cement Masons' International Assoc. of the United States and Canada,* 537 F.2d 669 (2nd Cir. 1976); *Celotex Corp. v. OCAW,* 516 F.2d 242 (3rd Cir. 1975) [harmless error]. *But see: Piedmont Aviation, Inc. v. Air Line Pilots Ass'n International,* 416 F.2d 633, 637 n. 7 (4th Cir. 1969).

23. The procedure under which the October temporary restraining order was issued was in full compliance with Rule 65(b) of the Federal Rules of Civil Procedure. *See generally* Wright & Miller, *Federal Practice & Procedure*: Civil §§ 2951–2952.

24. This Court had jurisdiction to enter the October 18, 1980 temporary restraining order, the Norris-LaGuardia Act notwithstanding. *Chicago & Northwestern Ry. Co. v. United Transportation Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Trainmen v. Chicago R. & I. R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *Virginian R. Co. v. System Federation No. 40,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); *Atlanta & West Point R. Co. v. United Transportation Union,* 439 F.2d 73 (5th Cir. 1971), *cert. denied,* 404 U.S. 825, 92 S.Ct. 53, 30 L.Ed.2d 53 (1971). Therefore, the defendants' Motion to Vacate is DENIED.

■ 25. The contempt of defendant ALPA of the prohibitions contained in the temporary restraining order could be established by the "mass action" of the union's membership, by the actions of the union's officials acting within their apparent authority, or by the acts of union members which the union can be held to have ratified by its inaction. *Black Diamond Coal Mining Co. v. UMW Local 8460,* 597 F.2d 494, 495 (5th Cir. 1979); *United States Steel Corporation v. United Mine Workers,* 598 F.2d 363, 365 (5th Cir. 1979).

■ 26. Although plaintiff established that a significant number of union members have violated the temporary restraining order, plaintiff failed to adduce clear and convincing evidence that the number of such members constituted such a sufficiently significant proportion of the union's membership to constitute a basis for the union's liability under the mass action theory.

27. Although the plaintiff adduced evidence tending to demonstrate that officials of defendant ALPA failed to take aggressive measures to ensure its members did not violate the Court's order, plaintiff failed to establish clear and convincing evidence that such inaction constituted a ratification of violations by unidentified union members or a failure to obey the "take all steps within their power" requirement of the October temporary restraining order. Therefore, the plaintiff's application to hold defendant ALPA in contempt of this Court's October 18, 1980 temporary restraining order is DENIED in all respects.

28. The plaintiff is to provide the Court with a proposed judgment within ten (10) days after conferring with counsel for the defendants.

Each party will bear its own costs.