**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Plaintiff-Appellee, Cross-Appellant,**

v.

**UNITED AIR LINES, INC., Defendant-Appellant, Cross-Appellee.**

Nos. 85–2726, 85–2833.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1986.

Decided Sept. 29, 1986.

As Amended Sept. 30, 1986.

Stephen P. Sawyer, United Air Lines, Inc., Elk Grove Township, Ill., for defendant-appellant, cross-appellee.

Michael E. Abram, Cohen, Weiss & Simon, New York City, for plaintiff-appellee, cross-appellant.

Before WOOD, and Coffey, Circuit Judges, and NOLAND, District Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

This case arises out of a twenty-nine day strike by the Air Line Pilots Association, International ("ALPA") against United Air Lines, Inc. ("United"). Although the parties ultimately reached a new collective bargaining agreement, three issues which evolved as a result of the strike remain for judicial resolution. The first issue concerns United's plan that allowed pilots who worked during the strike to "bid" for vacancies left by the striking pilots. The second issue involves permanent replacement pilots that United hired during the course of the strike. United agreed to pay these pilots a guaranteed salary as a means of inducing them to work for the airline. The final issue involves the treatment of prospective new second officers who were in training prior to the commencement of the strike (hereinafter the "Group of 500"). United had anticipated using these trainees as replacement pilots and had offered them employment beginning on May 17, 1985, the day ALPA went on strike.

With respect to these issues, ALPA filed suit alleging various violations of the Railway Labor Act, as amended, 45 U.S.C. § 151 *et seq.* (1982) (the "RLA" or the "Act"). Following a ten-day trial, Judge Nicholas J. Bua concluded: (1) that United had violated the RLA by opening vacancies to rebidding by pilots who had crossed the picket line; (2) that the terms and conditions under which United hired its permanent replacements, including the guaranteed salaries, were lawful; and (3) that the Group of 500, although not employees during their training period prior to the strike, became employees of United on May 17, and that United's failure to extend them employee status on that date was in contravention of the RLA. In the alternative, even assuming that the Group of 500 never became employees, the trial judge found that United: (1) violated the RLA's status quo provisions by treating the trainees as non-employees during the training period; and (2) violated the RLA's provision against coercing persons not to join a union by making employment for the Group of 500 contingent on crossing the picket line.[1] The district court initially enjoined United from implementing the bid awards made during the strike as well as barred the airline from giving nonstrikers preference in any vacancy arising subsequent to the strike. The court also ordered United to reinstate those members of the Group of 500 who had respected the picket line and "to assign them immediately to line pilot service if they completed their training without discrimination, and then enter line service, with seniority in all cases accrued from May 17, 1985." 614 F.Supp. at 1051. Thereafter, the district court amended its order regarding the Group of 500 to provide that United only be required to place these pilots on a preferential hiring list so that they would be hired as positions became available. In addition, the court denied ALPA's motion seeking back pay for the Group of 500.

On appeal, United argues that the court erred in holding: (1) that its bidding procedures were unlawful; (2) that the Group of

---

[*] The Honorable James E. Noland, Chief Judge of the United States District Court for the Southern District of Indiana, is sitting by designation.

1. The district court's opinion is reported at 614 F.Supp. 1020.

500 became employees on May 17; and (3) that the status quo provisions of the RLA were violated by United's considering the Group of 500 as non-employees during training. United also argues that the district court erred in granting injunctive relief to ALPA since the union had used *economic coercion during the statutory status quo period before the strike and had initially refused to ratify its agreement with United until United reached a satisfactory back-to-work agreement with its flight attendants. ALPA cross-appeals alleging that the district court erroneously: (1) upheld United's guaranteed salaries to replacement pilots; (2) ruled that the Group of 500 were not entitled to immediate reinstatement; and (3) refused to award the Group of 500 back pay for the time between the end of the strike and their reinstatement.

We affirm the district court's decisions with respect to the replacement pilots and the implementation of the *rebid procedures.* However, we reverse the court's decision regarding the Group of 500.

## I.

The district court made extensive findings of fact which we summarize below. We are, of course, required to adopt these factual findings unless they are shown to be clearly erroneous. *See* Fed.R.Civ.P. 52(a).[2]

The present action was commenced by ALPA on May 16, 1985, *i.e.,* one day prior to the commencement of the strike. ALPA is the duly certified representative for Unit-

ed's airline pilots under the RLA. The representation of United's pilots is controlled by the United Air Lines Master Executive Council ("UAL–MEC"). UAL–MEC is composed of three elected member pilots from each of United's nine pilot domiciles.[3]

For a number of years prior to the strike United and ALPA had been parties to successive collective bargaining agreements. The agreement controlling prior to the strike had been in effect since October 1981. This agreement was to be effective until October 1983 and would automatically renew itself for a one-year period each October thereafter unless either party sought a change. In January 1984, both parties served notice of their desire to discuss new contractual terms. United sought to renegotiate, among other things, compensation to be paid both incumbent employees and new hires as well as the method used to assign cockpit seats to pilots. United was seeking changes, in part, as a result of economic pressures to cut costs which accompanied the deregulation of the airline industry. As negotiations progressed, it became obvious that the key issue was United's desire to have a reduced pay scale for those pilots hired during the duration of a new agreement. United expressed concern that without cost-cutting measures it would not be competitive in the newly deregulated market. Indeed, although United had an operating profit of in excess of $500 million in 1984, it had sustained operating losses in the preceding five years.

---

**2.** Rule 52(a) provides in pertinent part:
Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. As defined by the Supreme Court, a factual finding is not clearly erroneous if "plausible in light of the record viewed in its entirety," even if the appellate court "would have weighed the evidence differently" and reached the opposite conclusion. *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). An appellate court should overturn a district court's finding of fact only if after having reviewed the entire evidence it " 'is

left with the definite and firm conviction that a mistake has been committed.' " *Id.* 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Unlike findings of fact, the district court's conclusions of law are subject to *de novo* review on appeal.

**3.** Each of United's pilots operates from one of nine bases known as domiciles. A domicile is the place from which a pilot's assignment begins and to which he returns. At the time of the strike, United's pilot domiciles were Chicago, Cleveland, Denver, Honolulu, Los Angeles, Miami, San Francisco, Seattle, and Washington.

Although continuing with the negotiations, United, in the fall of 1984, began to prepare for a pilots' strike by establishing a task force to develop contingency plans. The task force devised the "operations adjustment plan" which had an objective of breaking any strike and forcing settlement on United's terms. At the same time, United also began to experience a shortage of pilots. United had last hired pilots during the period from 1977–1979. At that time, it had been United's policy to consider its student pilots as employees beginning with their first day of training. These trainees were paid and earned seniority from the first day of their hire. Once these student pilots completed the training process, they were brought into United to serve in the entry-level position of second officer.[4]

With the need for new pilots evident, United, beginning in November 1984, selected numerous candidates (*i.e.*, the Group of 500) for its training program. During this time, however, while United negotiated with ALPA with respect to the new-hire pay scale, the airline did not want the trainees on its property fearing that their presence would make an agreement with ALPA on new-hire pay more difficult. United also was opposed to paying the trainees the rates for incumbents as provided in the 1981 agreement. United therefore stated that these trainees would not be offered employment until after an agreement had been reached with ALPA. Indeed, the student pilots who were selected for training were required to execute a "Flight Officer Training Agreement." Under this agreement, the student pilots would receive training without charge from United as well as $30 per day to cover their expenses. The students agreed that during training they were not employees of United and received no compensation for their services apart from the expense money. The agreement, which each trainee signed, also provided:

> I understand that graduates of Flight Officer Training will constitute a pool of trained candidates for Flight Officer em-

ployment, which United Airlines may employ, if needed, within twelve months of graduation. I understand that in order to be offered such employment, that I must continue to meet the requirements and qualifications for the flight officer position.

Pursuant to the agreement United was free, without incurring liability, to terminate the training or never make an offer of permanent employment.

In April 1985, United offered approximately 375 members of the Group of 500, who had successfully completed their training, positions as second officers. The offers of employment were effective May 17, 1985, regardless of whether a strike had commenced. The district court concluded that when initially offered employment the Group of 500 were not hired to serve as "crossovers" in the event of a strike. Indeed, several of the student pilots indicated that United had told them that they would not be asked to cross a picket line. As the May 17 strike deadline approached, however, United began to see the Group of 500 as strike replacements and informed the members that if they failed to report to work they would not work for the airline in the future. In fact, United's Chairman and Chief Executive Officer Richard Ferris commented:

> We have got 500 pre-hires, right? Those pre-hires are all going, they've been given notice, and come 0001 May 17, they're employed, boom. If they don't show up to work, they will never, ever, work for this air line, ever, because they're not on the property, they won't have a number, they don't have anything.

Nonetheless, the student pilots had a disincentive to report to work during a strike. Under ALPA's constitution and by-laws a member-pilot is subject to expulsion for "[p]erforming work for or assisting an airline during a period when the members of [ALPA] are on strike against such airline." ALPA constitution art. VIII, § 2(A)(5). Moreover, applicants for ALPA membership who were "involved in alleged

---

**4.** United employs pilots in three categories: cap- tain, first officer, and second officer.

strikebreaking shall not be accepted for membership" except, as the district court found, pursuant to rigorous procedures. *Id.*, art. II, § 10(B).

Apart from plans regarding the Group of 500, United also promised other policy changes in an attempt to lure pilots across the picket line in the event of a strike. These plans were communicated to United's pilots via letters and various "road shows" undertaken by United management personnel. One plan called for United to allow "bidding" for positions opened up by a strike. Under United's bid procedure, pilots could express their interest for, among other things, vacant higher-level positions for which they were qualified as well as for other pilot domiciles. If a pilot's bid was accepted, he was then able to advance to his desired position. By allowing a rebid of the entire airline subsequent to the commencement of a strike, United sought to induce its pilots to ignore the strike for fear that they would lose their present positions and be impeded from advancing in the future by less-senior pilots.

In addition to rebidding the airline, United also informed its pilots that it was intending, in the event of a strike, to hire as permanent replacements for striking pilots outside individuals who were already qualified to serve as captains or first officers. To induce these "fleet-qualified" pilots to work for the airline during a strike, United was prepared to pay captains an annual salary of $75,000 and first officers a salary of $50,000. United also promised to guarantee these salary levels even if the replacement pilots were later reassigned to lower positions. Use of these guaranteed salaries was another means United hoped would help keep the airline flying in the event of a strike.

By April 15, 1985, United and ALPA had failed to reach a new collective bargaining agreement and the National Mediation Board ("NMB"), which had become involved in the negotiations during the previous August, declared an impasse in negotiations. On April 16, the final thirty-day "cooling-off" period mandated by the RLA began. During this period United and ALPA continued their collective bargaining, but their efforts were to no avail. On May 17, ALPA struck United. Approximately 500 pilots reported to work during the first three days of the strike, 250 of these being management pilots. Only a few members of the Group of 500 crossed the picket line and those already at United facilities left.

Shortly after the strike began, United cancelled all of its pilot assignments both for striking and nonstriking pilots. The result of this action was to create vacancies in every position in the airline. Nonstriking pilots who had reported to work before 6:00 p.m. Chicago time on May 19 were allowed to bid on these vacancies with the exception of the Miami and Washington domiciles. The vacancies were not actually awarded until after June 1, 1985, and, during the strike, no pilot was activated in any assignment awarded to him in the rebid. As a result of the rebid, nonstriking pilots were able to leapfrog over more senior striking pilots. In addition to the rebid, United also employed the guaranteed salaries to attract fleet qualified pilots to serve as permanent replacements for striking pilots.

For its part, ALPA also took actions both before and during the strike in order to protect its interests. United alleges that, prior to the strike, ALPA undertook a campaign to inform travel agents around the country of the impending strike and suggested that these agents book their clients on airlines other than United. Moreover, United also contends that ALPA members engaged in a concerted abuse of sick leave to put economic pressure on the airline as well as picketed the World Trade Conference hosted by United's Chairman and Chief Executive Officer Richard Ferris in an attempt to dissuade conference attendees from using United. Once the strike began, ALPA also instructed its strike supervisors to take pictures of the pilots and management personnel who crossed the picket line. ALPA also photographed working pilots at this time.

During the course of the strike, ALPA and United resumed their contract negotiations. In June 1985, the parties reached a tentative back-to-work agreement. Under this agreement the pilots would return to work and assume the same positions they had held prior to the strike. Both United and ALPA agreed not to punish either the striking or nonstriking pilots. With respect to the status of the members of the Group of 500, the rebid, and the replacement pilots, however, United agreed that ALPA would pursue its claims in the district court. Although United agreed to restore all pilots to their pre-strike positions, when new vacancies arose, either due to attrition or expansion, United stated it would award the vacancies, in order of seniority, to nonstriking pilots who had been awarded similar positions during the strike rebid. In other words, nonstrikers were to be given preference over strikers. United also maintained that it would not hire any member of the Group of 500 who had failed to report to work except for cases involving personal hardship or other extenuating circumstances. Finally, United stated that it planned to continue to pay the guaranteed salaries to the fleet-qualified replacements.

Apart from its own agreement, ALPA had also discussed with United how the airline would handle its dispute with the Association of Flight Attendants ("AFA") whose members had honored ALPA's picket line. In keeping with a pre-strike commitment, ALPA maintained that its back-to-work agreement would be contingent upon AFA also reaching a back-to-work agreement. Ultimately AFA released ALPA from its commitment. ALPA subsequently ratified the tentative agreement with United and the strike came to an end.

ALPA filed suit alleging that United's actions with respect to the Group of 500, the rebid procedure, and the guaranteed salaries for the replacement pilots violated the RLA. The district court agreed with ALPA regarding the rebid and the Group

of 500, but held that the hiring of the replacement pilots was lawful. The court ordered that United be enjoined from implementing the strike bid awards and also from preferring nonstrikers over strikers in vacancies that may arise. The court directed United to restore the Group of 500 to employee status and to assign them immediately to line service if they have completed training or allow them to first complete training. In so ruling, the district court rejected United's contention that ALPA was not entitled to injunctive relief on grounds that it had violated the RLA by conditioning the end of the strike upon United reaching a back-to-work agreement with AFA and by otherwise acting with "unclean hands."

The court subsequently amended its order noting that the Group of 500 had been permanently replaced during the strike and hence that they had no right to immediate employment, but rather were to be given preference when vacancies arose. The court also denied ALPA's motion seeking back pay for the Group of 500. The court noted that since these pilots had been properly replaced during the strike they were entitled to only back-dated seniority and preferential hiring.

United appeals the court's decision arguing that it was error to hold the airline in violation of the RLA with respect to the Group of 500 and the rebid procedure. Even if its actions are unlawful, United contends that ALPA is not entitled to injunctive relief. ALPA cross-appeals alleging that, among other things, the court erred in holding that United's hiring of replacements was lawful and in ruling that members of the Group of 500 were not entitled to either immediate reinstatement or back pay.

## II.

Before reaching the merits of this case, it is necessary that we first briefly examine the relevant provisions of the RLA.[5] As the Supreme Court noted in *Brotherhood*

5. Congress made the RLA applicable, with few exceptions not relevant here, to the airline in-

dustry in 1936. *See* 45 U.S.C. § 181 *et seq.* (1982).

*of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), the "heart" of the RLA is the duty placed on management and labor " 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.' " *Id.* at 377–78, 89 S.Ct. at 1115 (quoting 45 U.S.C. § 152, First (1982) ). *See* 45 U.S.C. § 151a(1) (one purpose of the RLA is "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein"). *Accord Chicago & North Western Railway v. United Transportation Union*, 402 U.S. 570, 574, 91 S.Ct. 1731, 1734, 29 L.Ed.2d 187 (1971). The RLA was enacted to encourage collective bargaining by the parties "in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce," especially in cases where major disputes [6] are involved. *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969) (footnote omitted).

In settling major disputes such as the one involved here under the RLA a two-stage process is followed. The party seeking a change in rates of pay, rules, or working conditions must first give notice and confer with the other party. 45 U.S.C. § 156 (1982). *See* 45 U.S.C. § 152, Second (1982). If this conference fails to resolve the dispute, either or both parties may seek the mediation services of the National Mediation Board. The NMB may also act, *sua sponte*, in an emergency situation. 45 U.S.C. § 155, First (1982). If mediation by the NMB proves to be unsuccessful, the NMB is required to endeavor to induce the parties to submit the matter to binding arbitration. However, arbitration cannot be forced upon the parties; rather, arbitration is permitted only where the parties mutually consent. 45 U.S.C. §§ 155, First, 157 (1982). If arbitration is rejected and if the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," the NMB must contact the President who is then free to create an emergency board to "investigate and report respecting such dispute." 45 U.S.C. § 160 (1982). Throughout this first step of the mandated dispute resolution, the parties are barred from unilaterally altering the established status quo. 45 U.S.C. §§ 152, Seventh, 155, First, 156, 160 (1982).

Once these procedures have been followed without the dispute being resolved, the parties are free in the second stage, except as they may be otherwise limited by statute, to engage in economic self-help. Although the RLA is silent as to what may lawfully occur in this period, *Burlington Northern Railroad v. Brotherhood of Maintenance of Way Employees*, 793 F.2d 795, 799 (7th Cir.1986), it is undisputed that "[i]mplicit in the statutory scheme ... is the ultimate right of the disputants to resort to self-help—'the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration.' " *Jacksonville Terminal Co.*, 394 U.S. at 378, 89 S.Ct. at 1115 (quoting *Florida East Coast Railway v. Brotherhood of Railroad Trainmen*, 336 F.2d 172, 181 (5th Cir.1964), *cert. denied*, 379 U.S. 990, 85

---

**6.** Non-representational disputes arising under the RLA are characterized either as major or minor disputes. Depending upon the type of dispute encountered, the RLA prescribes different adjustment procedures for resolution. A minor dispute is one involving questions regarding the application or interpretation of an existing collective bargaining agreement. Conversely, a major dispute, such as the one involved here, "relates to ... the formation of collective bargaining agreements or efforts to secure them." *Elgin, Joliet & Eastern Railway v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). *See Burlington Northern Railroad v. Brotherhood of Maintenance of Way Employees*, 793 F.2d 795, 798–99 (7th Cir.1986). The RLA does not use the terms "minor" and "major" dispute; rather, these terms were coined by the Supreme Court in *Elgin, supra. Local 553, Transport Workers Union of America v. Eastern Air Lines, Inc.*, 695 F.2d 668, 673 (2d Cir.1982).

S.Ct. 703, 13 L.Ed.2d 611 (1965)). This is not to say, however, that a disgruntled employer is free to use self-help measures to rid itself of a union or unnecessarily alter the employer-employee relationship. Unions and the employees they represent are similarly limited in the types of self-help measures they can employ. *See Jacksonville Terminal Co.*, 394 U.S. at 392, 89 S.Ct. at 1123 (recognizing that "parties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute [are allowed] to employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law"). *Cf. Brotherhood of Railway & Steamship Clerks v. Florida East Coast Railway*, 384 U.S. 238, 247, 86 S.Ct. 1420, 1425, 16 L.Ed.2d 501 (1966) (noting that in a case where the collective bargaining agreement is still in effect that "[w]hile the carrier has the duty to make all reasonable efforts to continue its operations during a strike, its power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Railway Labor Act is to be honored") (footnote omitted).

With respect to unions, the RLA provides specific statutory protections which ensure that an employer cannot implement measures under the guise of self-help which are intended solely to destroy a union's ability to represent its membership. *See* 45 U.S.C. § 151a(2) (one purpose of the RLA is "to forbid any limitation on freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization") (1982).[7] For example, the Act provides that employee and employer representatives for collective bargaining purposes be chosen "by the respective parties without interference, influence, or

coercion by either party." 45 U.S.C. § 152, Third. Similarly, "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing." 45 U.S.C. § 152, Fourth. In order to protect this right, the RLA provides that management may not

> deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions. . . .

*Id.* In the same way, the RLA also prohibits management from requiring "any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization." 45 U.S.C. § 152, Fifth.

In the present case, the problem we face is to ascertain whether the various self-help measures employed by both United and ALPA unlawfully impinged upon statutory protections provided under the RLA. At first glance, it may seem that this problem could be easily resolved; either an action is or is not in contravention of federal law. However, in reality, it is a difficult question to determine when, if ever, an

---

**7.** We recognize that in *Burlington Northern Railroad, supra,* we stated that the "purposes laid out in § 151a are useful only in understanding the meaning of the terms that appear in the statute" and that "[t]hey are not warrants for inventing prohibitions the Railway Labor Act does not contain." At 803. The instant case involves, as opposed to the situation in *Burling-* *ton,* specific statutory protections which limit the scope United's self-help measures could take. Accordingly, we need not rely on section 151a to derive limits to self-help, but rather can look to express statutory language. In so doing, we are free to examine section 151a, as we noted in *Burlington,* to facilitate our statutory interpretation.

otherwise legitimate self-help measure begins to impede upon a statutory protection. In implementing self-help measures to ensure the continuation of its operation during the strike, United necessarily acted, either intentionally or unintentionally, in ways that adversely affected ALPA members. Similarly, ALPA acted in ways which adversely affected United. In such a situation, it was inevitable that a clash occurred between United's right to self-help and ALPA members' right to organize without being coerced or influenced. Our function now is to determine whether the appropriate balance between competing rights was achieved. *Cf. Empresa Ecuatoriana De Aviacion S.A. v. District Lodge No. 100*, 690 F.2d 838, 844–45 (11th Cir.1982) (upholding in a minor dispute case, the district court's conclusion that "the carrier struck a proper balance between its twin obligations to serve the public and to attempt reasonably to maintain the employer-employee relationship"), *cert. dismissed*, 463 U.S. 1250, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983).

The first issue we reach in this regard is whether the district court erred in concluding that United's rebidding of the airline violated the RLA. The district court found that United's rebid was unlawful since the airline "failed to justify the rebid as reasonably necessary for its operations during the strike" and because United's actions were motivated by anti-union considerations.

As the district court noted, it is well-established under the RLA that once the mediation and arbitration step has been completed, albeit unsuccessfully, both sides are free to engage in self-help as a means of continuing operations as well as a means of inducing a settlement. As a result, United was free within certain bounds to take the steps necessary to continue flying; the airline's right to employ self-help measures during the strike stopped, however, where its duties under the RLA and other laws began. *See Jacksonville Terminal Co.*, 394 U.S. at 392, 89 S.Ct. at 1123.

ALPA contends, citing 45 U.S.C. § 152, Third and Fourth, that the RLA prohibits employers from retaliating against employees for engaging in a lawful strike. Although we agree with this proposition as a general matter, our analysis cannot end here. The real issue is what constitutes unlawful retaliation. It goes without saying that since the Act provides for the use of self-help by an employer, all measures of self-help cannot constitute unlawful retaliation. To assist us in resolving this issue ALPA suggests that we refer, as the district court did, to the National Labor Relations Act (the "NLRA" or the "Wagner Act"), 29 U.S.C. § 151 *et seq.* (1982) "as a definitive guide to contemporary meaning" of identical terms used both in the NLRA and the RLA. ALPA contends that the similarity between the relevant provisions of the NLRA and the RLA mandates that the two statutes be generally interpreted in the same way.

United, on the other hand, argues that the NLRA and the RLA were never intended by Congress to be applied in similar fashions, an intent the courts, United contends, have respected. The Second Circuit has noted that the NLRA and the RLA were directed at remedying problems in different arenas where the relative economic power of the participant labor organizations vis-a-vis the employer varied:

> The special situation in the railroad industry, where strong unions and management had become used to dealing with each other, differed vitally from the host of problems at which the Wagner Act was aimed—businesses of every size and description, many with a history of strong anti-union bias and with ample opportunity for strong-arm tactics. It was thus natural that the Wagner Act should stress administrative adjudication whereas the earlier Railway Labor Act relied primarily on mediation.

*Ruby v. American Airlines, Inc.*, 323 F.2d 248, 256 (2d Cir.1963), *cert. denied*, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964). *See Klemens v. Air Line Pilots Association, International*, 736 F.2d 491, 496 (9th Cir.) (noting that "[t]he NLRA and

the RLA are fundamentally different"), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 435, 83 L.Ed.2d 362 (1984). Indeed, even the Supreme Court has concluded that "the National Labor Relations Act cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes." *Jacksonville Terminal Co.*, 394 U.S. at 383, 89 S.Ct. at 1118 (footnote omitted). *Accord Chicago & North Western Railway v. United Transportation Union*, 402 U.S. at 579 n. 11, 91 S.Ct. at 1736 n. 11 (noting that "all parallels between the NLRA and the [RLA] ... should be drawn with the utmost care"); *Ruby*, 323 F.2d at 256 ("the claim that the courts should do under the Railway Labor Act what Congress directed the NLRB to do under the National Labor Relations Act not only flies in the face of the difference in the language and scheme of the two statutes but ignores the diverse problems to which they were addressed").

Although it is clear that comparisons between the NLRA and the RLA must be carefully constructed, we nonetheless believe that the district court did not err, though relying on cases interpreting the NLRA, in concluding that United's implementation of the rebid was unlawful. In its ruling, the district court relied heavily upon the Supreme Court's decision in *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). In *Erie Resistor*, the Court held, even in the absence of a showing of illegal motive on the part of the employer, that it was an unfair labor practice under section 8(a) of the NLRA, 29 U.S.C. § 158 (1982), for an employer to give preference to replacements and nonstriking workers by giving them a twenty-year seniority credit relative to those workers who refused to cross the picket line. 373 U.S. at 236–37, 83 S.Ct. at 1149–50.

■ Although ALPA argues that *Erie Resistor* controls here, and that any type of

super-seniority serves necessarily to undermine a union in contravention of the RLA, we need not reach that issue.[8] First, as noted above, simply because a practice is deemed unlawful under the NLRA does not automatically translate into a finding that the same practice is unlawful under the RLA. Second, and more important, are the findings made by the district court that the rebid procedure employed by United was not needed for it to continue during the strike and that the rebid was motivated by anti-union sentiment.

With respect to the business necessity for the rebid, it is uncontested that throughout the strike no nonstriker actually filled a vacancy that was awarded during the rebid. Yet, at the same time, the rebid significantly harmed those pilots who refused to cross the picket line. For example, Group of 500 members who crossed the picket line were able to gain between 2,960 and 5,090 places on the seniority list in bidding for DC–10 captain positions. In some cases this represented a jump in seniority of between 19 to 29 years. The jump in seniority for B–727 captains bidding for DC–10 or B–747 captain positions was five years (from B–727 captain median seniority to DC–10 captain lowest seniority) and a $24,000 pay increase.

■ In *Brotherhood of Railway & Steamship Clerks v. Florida East Coast Railway, supra,* the Supreme Court held that changes in the relationship between employer and employee that result from self-help measures implemented must be shown to be reasonably necessary to keep the operation of the carrier ongoing in order to be lawful under the RLA. 384 U.S. at 248, 86 S.Ct. at 1425. "[T]he burden is on the carrier to show [that] the need for any alteration of" the collective bargaining agreement is necessary "in order to maintain that continuity of operation that the law requires of it." *Id.* Although *Brotherhood of Railway & Steamship Clerks v. Florida East Coast Railway* arose in a situation where the collective bargaining

---

8. Because of our resolution of this issue, we do not consider United's argument that the rebid

did not involve the type of super-seniority which the Court found unlawful in *Erie Resistor.*

agreement was still in effect, we see no reason to depart totally in the post-contract period from its holding that some showing of a reasonable business justification is required before a court will allow an employer to implement self-help measures which, whether intentional or not on their face, undercut the union's ability protected by the RLA to function as an effective representative for its members. *See Erie Resistor,* 373 U.S. at 228, 83 S.Ct. at 1145 (noting that "[t]he employer ... must be held to intend the very consequences which foreseeably and inescapably flow from his actions"). *But cf. Belknap, Inc. v. Hale,* 463 U.S. 491, 504–05 n. 8, 103 S.Ct. 3172, 3179–80 n. 8, 77 L.Ed.2d 798 (1983) (discussing validity of requirement that permanent replacements can only be hired when business necessity is shown). The provisions of the RLA that seek to protect employees' rights to join and participate in a union would seem to require nothing less.

In the present case, although striking ALPA members would be harmed by the rebid, United now seeks to impose it on its pilots solely in order to keep its word to those pilots who crossed the picket line. United does not contest the district court's conclusion that the rebid was not necessary to ensure the continuation of the airline's operations during the short-lived strike that actually took place, and, in fact, concedes that the rebid had little impact upon pilots in terms of inducing them to report to work "as demonstrated by the pilots' solidarity in honoring the picket line." (Defendant-Appellant's Reply Br. at 50 n. 46). From this lack of efficacy it is at least arguable that the rebid was devoid of any business justification whatsoever, and we could accordingly conclude that United's actions were merely meant to coerce pilots to abandon their membership in the union in violation of the RLA.

In the typical situation, however, the failure of an allegedly lawful self-help measure to effectuate a desired result may well not be a sufficient basis upon which to conclude that the employer's motive in implementing the measure was to destroy the employees' union. Indeed, in the present case, United argues that the rebid was not only an attempt to induce pilots to cross the picket line, but was also the first step in rebuilding the airline's pilot structure. United contends that by rebidding the airline early in the strike it was in a better position to determine its future needs so that pilots could be trained for vacant positions in the event the strike were to continue for a long time. If this were all that the record revealed, we would be inclined to agree with United that its rebid was necessary to keep the airline flying.

The record to the contrary shows, however, as the district court concluded, that United's actions with respect to the rebid were taken more out of spite for ALPA than in hopes of rebuilding the airline.[9] *See Erie Resistor,* 373 U.S. at 228, 83 S.Ct. at 1145 ("Conduct which on its face appears to serve legitimate business ends ... is wholly impeached by the showing of an intent to encroach upon protected rights. The employer's claim of legitimacy is totally dispelled.") (footnote omitted). The trial court found that ALPA "established specific evidence of United's intent of coercion and discrimination against union membership by virtue of the rebid procedure." 614 F.Supp. at 1046. In fact, the court noted that United's rebid was part of a plan "which was intended to break the strike by causing a 'stampede' of striking pilots to cross the picket line." *Id.* The record further indicates that when a United official presented the rebid plan to a meeting of the airline's corporate officers, no business justification was given for the plan. Even United Chairman Ferris conceded that the rebid plan was meant to cause " 'penalty and harm and hurt' " and if the pilots refused to work " 'the harm will hit, and the union will never negotiate that away.' " 614 F.Supp. at 1031.

■ United argues that the district court erred in inferring that the rebid was moti-

---

9. Whether or not a showing of business necessity could legitimize the rebid as a lawful self-help measure in the absence of anti-union motivation is a question we leave for another day.

vated by anti-union sentiment. We disagree. Our review of the record indicates that the rebid was an attempt by United either to destroy the union or at the very least discourage union membership. In other words, we do not believe, contrary to United's position, that the trial court's findings with respect to anti-union motivation are clearly erroneous and, therefore, they must be upheld.[10]

 The existence of anti-union motivation, by itself, provides a sufficient basis upon which to uphold the district court's decision with respect to the rebid procedure. An employer is not free under the RLA, in the guise of self-help, to act "to influence or coerce employees in an effort to induce them ... not to join or remain members of any labor organization." 45 U.S.C. § 152, Fourth. *Cf. Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir.1974) (noting that under the RLA "[a]nti-union motivation invalidates even a discharge which could be justified on independent grounds"). Although United had the right to employ self-help, that right was limited. Under the circumstances presented here, we can only conclude that, in the balance between United's right to self-help and its duty to respect ALPA's right to exist and function, the district court did not err in finding that United's actions regarding the rebid violated the RLA.[11]

Even conceding, *arguendo*, that its rebid violated the RLA, United argues that ALPA is nonetheless ineligible for the injunctive relief the district court granted because of "unclean hands." United contends that ALPA's bargaining to impasse with respect to and conditioning ratification of the new agreement upon United reaching a back-to-work agreement with the flight attendants, ALPA's photographing of nonstriking pilots, and its use of economic warfare during the cooling-off period constitute "unclean hands" thereby disqualifying the union from receiving injunctive relief. United argues that these actions: (1) violated ALPA's duty to bargain in good faith under section 2, First of the RLA, 45 U.S.C. § 152, First; (2) constituted unlawful bad faith and coercive acts; and (3) violated the RLA's status quo provisions forbidding use of economic warfare prior to the end of the cooling-off period. The district court concluded, however, that United failed to establish that any of its affirmative defenses were a bar to ALPA receiving injunctive relief.

 In making its ruling, the district court correctly noted that any party seeking injunctive relief under the RLA must comply with section 8 of the Norris-La-Guardia Act, 29 U.S.C. § 108 (1982).[12] *See Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo, Peoria & Western Railroad*, 321 U.S. 50, 56, 64 S.Ct. 413, 416, 88 L.Ed. 534 (1944). Pursuant to section 8

[n]o restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available govern-

---

**10.** Although the district court characterized its findings of anti-union motivation as conclusions of law, in essence, they are factual findings and hence are reviewed under the clearly erroneous standard.

**11.** Because we conclude that United's rebid was motivated by anti-union sentiment, we have no need to consider United's arguments: (1) that the rebid was nothing more than a means of introducing permanent replacements into the system; (2) that the rebid was lawful since the collective bargaining agreement had expired and with it the pilots' seniority rights; and (3) that the rebid was consistent with the RLA since

a bargaining impasse had been reached and United was therefore free to effect changes in its agreement with ALPA. Even if we assumed that these arguments had merit and that United's actions would, in the normal case, be lawful, the existence of anti-union motivation in implementing the rebid still constitutes a violation of the RLA sufficient to uphold the district court's decision.

**12.** United's sole contention is that ALPA is ineligible for injunctive relief under the Norris-La-Guardia Act on the basis of "unclean hands."

mental machinery of mediation or voluntary arbitration.

29 U.S.C. § 108 (1982). In *Brotherhood of Railroad Trainmen,* the Supreme Court noted that in general terms section 8 places two requirements on a party seeking injunctive relief for violations under the RLA: "(1) to comply with any obligation imposed by law [and] (2) to make every reasonable effort to settle the dispute...." 321 U.S. at 56–57, 64 S.Ct. at 417. Failure to fulfill either one or both of these requirements will generally result in the complainant being denied relief. *Id.* at 57, 64 S.Ct. at 417.[13]

Although the Court's decision in *Brotherhood of Railroad Trainmen* could be construed as implying an absolute duty to fulfill the two prerequisites before injunctive relief could be forthcoming, in limited circumstances courts have refused such a mechanical approach. *See Illinois Central Railroad v. Brotherhood of Railroad Trainmen,* 398 F.2d 973 (7th Cir.1968) (per curiam). The Norris-LaGuardia Act has never been construed to bar an injunctive remedy when such relief is necessary to reach important objectives of federal labor law. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 251–52, 90 S.Ct. 1583, 1592–93, 26 L.Ed.2d 199 (1970). Rather, where parties seek injunctive relief under the RLA, the proper role of the courts is to ensure that the "obvious purpose" of both the RLA and the Norris-LaGuardia Act is preserved. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad,* 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). *See Chicago & North Western Railway v. United Transportation Union,* 402 U.S. at 583, 91 S.Ct. at 1738; *Virginian Railway v. System Federation No. 40,* 300 U.S. 515, 563, 57 S.Ct. 592, 606, 81 L.Ed. 789 (1937).

As a result, in dealing with the legal obligations component of section 8 as it relates to the RLA, courts have tended to weigh the competing equities to determine whether applying section 8's bar to injunctive relief would serve to further underlying purposes of both the RLA and the Norris-LaGuardia Act. In *Illinois Central Railroad v. Brotherhood of Railroad Trainmen, supra,* for example, we declined to employ section 8 as a bar to injunctive relief where the employer, who had arguably violated the status quo provisions of the RLA, was seeking a strike injunction. As we noted in that case:

> [E]ven if the Brotherhood were correct in contending that the railroad lacked clean hands, Section 8 of the Norris-LaGuardia Act would not of necessity preclude the issuance of an injunction against a strike by the Brotherhood.... "It may be that in a particular case the District Court might conclude that the imperatives of the Railway Labor Act override Section 8—a statutory focusing so to speak of an equity approach whereby lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved."

398 F.2d at 975–76 (quoting *Brotherhood of Railroad Trainmen v. Akron & Barberton Belt Railroad,* 385 F.2d 581, 614 (D.C.Cir.1967), *cert. denied,* 390 U.S. 923, 88 S.Ct. 852, 19 L.Ed.2d 983 (1968)). *See Chicago & North Western Transportation Co. v. United Transportation Union,* 495 F.Supp. 448, 452 (N.D.Ill.1980), *aff'd,* 656 F.2d 274 (7th Cir.1981).

With these principles in mind, we proceed to an examination of ALPA's conduct which United claims should bar the union from receiving injunctive relief. The first action United complains of is ALPA's bargaining tactics relative to the AFA's back-to-work agreement. United maintains, re-

---

**13.** United argued in a pretrial motion that ALPA violated the settlement component of section 8 by failing to accept NMB's proffer of arbitration. United had likewise declined the invitation to arbitrate the dispute in the prestrike period. The district court denied United's motion concluding that ALPA made every reasonable effort to settle the dispute. (The district court's opinion is reported at 610 F.Supp. 243). United does not appeal this ruling. Accordingly, we look only at United's contention that ALPA failed to comply with legal obligations thereby rendering the union ineligible for injunctive relief pursuant to section 8.

lying in part on *NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958), that a party such as ALPA may not, in good faith, bargain to impasse over permissive subjects of collective bargaining. In *Borg-Warner,* the Supreme Court ruled that under the NLRA parties are entitled to bargain to impasse over mandatory subjects of collective bargaining, *i.e.,* wages, hours, and other terms and conditions of employment, without violating their duty to bargain in good faith. With respect to other issues, *i.e.,* permissive or non-mandatory subjects, parties are not free to insist upon their position to impasse without violating their good faith bargaining duty. In other words, "good faith does not license the employer to refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining." *Id.* In the instant case, United alleges that ALPA violated its duty to bargain under section 2, First of the RLA when it bargained to impasse over the issue of AFA's back-to-work agreement. In short, United is contending that ALPA unlawfully bargained to impasse over a non-mandatory subject.

■ Although United fails to cite any decision in which a court applied the *Borg-Warner* analysis in a case arising under the RLA, our own research indicates that the mandatory-permissive distinction is applicable under section 2, First. *See Japan Air Lines Co. v. International Association of Machinists & Aerospace Workers,* 538 F.2d 46, 51–52 (2d Cir.1976) (appellate court affirming district court's application of mandatory-permissive distinction in case arising under RLA and rejecting union argument that labor and management should meet and negotiate with respect to any proposal advanced by either party); *Elgin, Joliet & Eastern Railway v. Brotherhood of Railroad Trainmen,* 302 F.2d 540, 543–44 (7th Cir.) (discussion of whether pension agreements constitute subjects of mandatory collective bargaining under the RLA), *cert. denied,* 371 U.S. 823, 83 S.Ct. 42, 9 L.Ed.2d 63 (1962). *Cf. First National Maintenance Corp. v. NLRB,* 452 U.S. 666,

686 n. 23, 101 S.Ct. 2573, 2585 n. 23, 69 L.Ed.2d 318 (1981) (noting that "[t]he mandatory scope of bargaining under the Railway Labor Act . . . [is] not coextensive with the National Labor Relations Act"). Indeed, the use of the mandatory-permissive distinction under the RLA is entirely consistent with its statutory framework. Section 2, First provides that parties "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." 45 U.S.C. § 152, First (1982). It is self-evident, therefore, that, unless parties are to be required to bargain over every issue, *see Japan Air Lines,* 538 F.2d at 51, the mandatory subjects under the RLA must be limited to those enumerated in the Act. From this it logically follows, that, given the parties' duty to exert every reasonable effort to reach agreement on these mandatory subjects, a refusal to bargain over these issues until an agreement is reached on a non-mandatory subject would violate a party's duty to bargain under section 2, First.

■ In the present case, ALPA argues that the issue of the AFA agreement was in fact a mandatory subject of bargaining and hence, even if we were to find that a bargaining impasse was reached on this issue, no violation of the bargaining duty occurred. However, we need not reach ALPA's argument since we conclude that, contrary to United's position, the district court did not err in finding that ALPA did not bargain in bad faith with respect to the AFA agreement. First, the district court concluded that United failed to present any evidence to support its "contention that ALPA sought to bargain over the provisions of a back-to-work agreement for flight attendants who honored ALPA's picket line." 614 F.Supp. at 1048. Our review of the record supports this finding and we hold that the district court's conclusion that no bargaining impasse was reached regarding the provisions of the

AFA agreement must stand since it is not clearly erroneous.[14]

■ Although finding no bargaining impasse with respect to the provisions of the AFA back-to-work agreement, the district court did note that ALPA informed United that it would honor its commitment not to ratify an agreement with United until the flight attendants had negotiated their back-to-work agreement. United contends that by conditioning the ratification of its own agreement upon AFA reaching a satisfactory agreement, ALPA violated its duty to bargain by insisting on a permissive subject of bargaining.

We recognize that under certain circumstances such a commitment, if carried out to the letter, could constitute a violation of the employees' duty to bargain in good faith. *NLRB v. South Atlantic & Gulf Coast District International Longshoremen's Association*, 443 F.2d 218 (5th Cir. 1971), involved, for example, a longshoremen's strike in which the picket line was honored by members of another union. Although the longshoremen eventually returned to work, they refused to do so until the employers reached an accord with the union that had respected the picket line. The Fifth Circuit held that the actions of the longshoremen violated their duty to bargain under the NLRA. In so doing, the court noted:

> When parties to collective bargaining reach a final agreement on the terms of the agreement, they have a duty to execute that agreement by written contract, and this duty may not be avoided by injecting extraneous issues into the negotiations.... [A]s put by the trial examiner: " ... A union enjoying statutory status as exclusive representative of all employees within a bargaining unit may not unilaterally extend the scope of its

agency authority and insist to impasse upon the employer's capitulation to the demands of other employees and other unions."

*Id.* at 220 (citations omitted).

Similarly, in *Standard Oil Co. v. NLRB*, 322 F.2d 40 (6th Cir.1963), the court held that the union violated its duty to bargain by refusing to execute an agreement with its employer. In so holding, the court noted with approval that the NLRB had concluded that the union's refusal "was unrelated to any dissatisfaction with the contract terms themselves but was based upon the [union's] unilateral decision to approve no agreement with the Company until negotiations were satisfactorily concluded by another local." *Id.* at 45.

Although United contends otherwise, we do not believe that the district court erred in finding that ALPA's behavior with respect to the AFA was not in contravention of its duty to bargain in good faith. Unlike the situation in both *South Atlantic* and *Standard Oil*, ALPA, though stating that it would not ratify its agreement until an agreement was reached with AFA, never carried out its threat. Indeed, AFA released ALPA from its obligation prior to the time ALPA was faced with the prospect of ratifying a new agreement with United. Moreover, ALPA never conditioned its negotiations upon United's reaching a satisfactory back-to-work agreement with AFA; rather, ALPA initially stated only that it would not ratify a tentative agreement once one was reached prior to the time that AFA reached an accord with United. Since ratification of the agreement between ALPA and United was never hindered by ALPA's promise to AFA, we find that ALPA's actions with respect to this matter were not in violation of its duty to bargain in good faith.

**14.** In the district court, United also argued that ALPA impermissibly bargained to impasse over issues involving the Group of 500 and Training Check Airmen ("TCAs"). On appeal, United does not raise any issue with respect to an unlawful impasse over issues relating to the Group of 500. In a footnote, United does contend that ALPA's insistence on bargaining over the TCAs was unlawful. United maintains that

the TCAs are management personnel and are hence excluded from protections afforded other employees under the RLA. Even if we assume this characterization is correct, United nonetheless fails to substantiate its claim that ALPA unlawfully bargained to impasse with respect to the TCAs. Without something more, we see no need to question the district court's finding that no impasse was reached on this issue.

■ The next action United claims gave ALPA unclean hands was the union's photographing of nonstriking pilots as they crossed picket lines and as they performed their duties during the strike. United argues that this action constituted unlawful coercion under the RLA. Although United raises this issue in its brief, it cites no authority interpreting the RLA to support its position nor does it even discuss the issue apart from its bare allegation that the conduct was unlawful. Nonetheless, it is generally acknowledged that it is unlawful for an employer under the NLRA to take photographs of picket line activity if the tendency of such action is to interfere with, restrain, or coerce employees engaged in protected concerted action. *See Flambeau Plastics Corp.*, 167 N.L.R.B. 735, 742–43 (1967), *enf'd*, 401 F.2d 128 (7th Cir.1968), *cert. denied*, 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969). At the same time, "an employer may validly photograph a picket line to substantiate picket line misconduct or to gather evidence for use in injunctive or unfair labor practice proceedings." *Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 681 F.2d 11, 19 (D.C.Cir.1982) (citing *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691, 700–02 (7th Cir.1976)), *cert. denied*, 459 U.S. 1178, 103 S.Ct. 831, 74 L.Ed.2d 1025 (1983). Although these cases arise under the NLRA, we see no reason why they do not apply equally as well to the RLA.

■ Simply recognizing that photographing picket lines may constitute unlawful conduct does not end our inquiry, however. The present case arises in a different context than those cited above. In both *Flambeau Plastics* and *Road Sprinkler Fitters*, it was the employers, as opposed to the employees as in the instant case, who were taking pictures in an attempt at coercion. Whether or not the RLA would protect an employee against coercive union action is a question neither United nor ALPA address. ALPA contends that we need not even reach that issue since its photography was solely a legitimate attempt to ascertain the extent of the strike by determining the number of pilots who crossed the picket line. Indeed, ALPA argues that United failed to present any evidence that the photography was intended to or had the effect of intimidating pilots who continued to fly for the airline.

In the end, we have no need to resolve either the issue of whether ALPA was barred from coercing its members or the issue of whether ALPA acted legitimately since even if we assume that ALPA's actions were unlawful, we still find that the district court did not err in granting injunctive relief. As noted above, courts have recognized that in the appropriate case the public interest imperatives of the RLA may override the Norris-LaGuardia Act's prohibition against granting injunctive relief to a party with unclean hands. In the present case, there was no evidence that ALPA's conduct harmed United. Moreover, the district court concluded, and we agree, that a denial of injunctive relief as it relates to the rebid procedure would only promote United's self-interest, while substantially harming those striking pilots affected by the unlawful rebid. Given the equities of the situation and since we have already concluded that the rebid is violative of the RLA, it would be an anomalous situation if the Norris-LaGuardia Act could be interposed to block a court from enjoining the implementation of an unlawful plan in this case. Without injunctive relief, United would seemingly be free to institute the rebid with impunity even though this court concludes that the contemplated action is unlawful. In such a situation, the Norris-LaGuardia Act cannot reasonably be seen to bar injunctive relief if the obvious purpose of the RLA is to be vindicated. *See Empresa Ecuatoriana De Aviacion*, 690 F.2d at 847 (noting that "a court must keep central to its consideration the national policies underlying the Railway Labor Act and not individual feelings of judges about who has and who has not behaved badly"). Accordingly, we conclude that the district court did not err in granting injunctive relief even though ALPA may have engaged in potentially unlawful photography.

The final category of conduct United claims bars ALPA from receiving injunctive relief encompasses several self-help measures that United alleges were taken prior to the exhaustion of the RLA's mandated procedures. United argues, therefore, that ALPA violated the status quo requirement of the RLA.

■ The first self-help measure United raises as a bar to equitable relief is ALPA's allegedly abusive use of sick leave. United contends that member pilots used their accumulated sick leave, although they were not ill, as an economic weapon against the airline in the pre-strike period. The district court concluded, however, that no status quo violation had been proven since United conceded that it had no evidence showing ALPA involvement in any plan to abuse sick leave. In fact, at trial, United failed to identify even a single pilot who had taken sick leave without being actually sick.

We have no doubt that a concerted union plan to abuse sick leave as an economic weapon in the pre-strike period could be found, in the appropriate circumstances, violative of the RLA. *See Texas International Airlines v. Air Line Pilots Association,* 518 F.Supp. 203 (S.D.Tex.1981). Nonetheless, as the district court noted, section 6 of the Norris-LaGuardia Act limits the extent of a union's potential liability:

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106 (1982). Under this statute, the district court's finding that ALPA was not involved in the alleged abuse of sick leave would generally end the discussion even if United was able to identify individual pilots who did abuse the system.

United, however, contends otherwise, relying on *Pan American World Airways, Inc. v. Independent Union of Flight Attendants,* 93 Lab.Cas. (CCH) ¶ 13,307, 20,-035 (S.D.N.Y. July 20, 1981). In *Pan American,* the court relied upon statistical evidence which revealed a "dramatic increase" in sick leave absences. *Id.* at 20,-036. Relying in part on this evidence the court issued an injunction against the "sickout" concluding that there is a serious question regarding whether the union had violated its obligations under the RLA "by encouraging, or at least making no reasonable efforts to discourage" abuse of sick leave by union members. *Id.* at 20,039. United, noting that the number of days of sick leave used by its pilots had doubled in the first four months of 1985, as compared with the same period in 1984, argues that such statistical evidence is sufficient to implicate ALPA in the alleged sick leave abuse scheme. We disagree.

In order to establish that section 6 of the Norris-LaGuardia Act does not insulate ALPA, United was required to show by "clear proof" ALPA's involvement with the sick leave abuse. As the district court noted, the clear proof standard required United to prove by clear and convincing evidence, as opposed to a preponderance, ALPA's involvement. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 737, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218 (1966). After reviewing the evidence, the district court found that ALPA was not engaged in promoting the abusive use of sick leave and United has failed to convince us that this finding is clearly erroneous. United, relying on *Pan American,* argues at some length that the mere existence of statistical data showing an increased use of sick leave is sufficient to establish union involvement in the scheme. In *Pan American,* however, there was much additional evidence indicating union involvement in the sickout apart from the statistical evidence including reports in the media and a notice posted on the union bulletin board. United's reliance on *Pan American* to support its proposition that statistical evidence stand-

ing alone is sufficient to overcome the trial court's finding is misplaced.

United also argues that the campaign to inform travel agents of an impending strike and the informational picketing of the World Trade Conference should bar ALPA from receiving injunctive relief. The district court refused to bar relief on these grounds concluding that such actions failed to rise to the level of self-help whose implementation would otherwise be prohibited in the pre-strike cooling-off period. The trial court, relying on the Supreme Court's decision in *Detroit & Toledo Shore Line Railroad, supra*, found that the status quo provisions of the RLA are only intended to prevent a union strike or to keep management from taking actions that would induce a strike. In *Detroit & Toledo Shore Line Railroad* the Court ruled that the status quo requirement of the RLA was designed "to prevent the union from striking and management from doing anything that would justify a strike." 396 U.S. at 150, 90 S.Ct. at 299.

■■■■ There is no question that the RLA's status quo requirement is intended to prevent a strike during the cooling-off period. *See Manning v. American Airlines, Inc.*, 329 F.2d 32, 35 (2d Cir.) (noting that the status quo requirement is "to prevent rocking of the boat by either side until the procedures of the Railroad Labor Act [have been] exhausted"), *cert. denied*, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964); *American Airlines, Inc. v. Transport Workers Union*, 57 L.R.R.M. (BNA) 2484, 2487 (S.D.N.Y. Apr. 17, 1964) ("The resort to economic self-help during the pendency of the procedures of the Railway Labor Act, by either party to a dispute, is inconsistent with the requirements of that Act."). To avoid any misunderstanding which may arise from a cursory reading of the district court's opinion, we must also note that union conduct, which may not be able to be classified literally as a strike, but which has the consequences of a strike, is also prohibited during the cooling-off period. *See Detroit & Toledo Shore Line Railroad*, 396 U.S. at 150, 152–53, 90 S.Ct.

at 299, 300–01. As the court in *United Air Lines, Inc. v. International Association of Machinists*, 54 L.R.R.M. (BNA) 2154 (N.D. Ill. Sept. 5, 1963), noted:

> The concerted refusal of overtime, slow-downs, sit-ins, strikes and other harassments by [the union and its members] is a violation of the duty imposed by the Railway Labor Act [*i.e.*, section 2, First] to exert every reasonable effort to settle all disputes in order to avoid any interruption to commerce or to the operation of any carrier.

*Id.* at 2156. *See Detroit & Toledo Shore Line Railroad*, 396 U.S. at 152, 90 S.Ct. at 300 (status quo provisions of the RLA "together with § 2 First, form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30–day 'cooling-off' period"). *See also Long Island Railroad Co. v. System Federation, No. 156*, 289 F.Supp. 119, 125 (E.D.N.Y.1968).

■■■■ United argues, relying on *American Airlines, Inc. v. Transport Workers Union, supra*, that ALPA's pre-strike discussions with travel agents and picketing constituted self-help which had the consequences of a strike and are therefore unlawful. In *American Airlines*, the district court enjoined the union from engaging in self-help during the pre-strike period which the court found to be violative of the RLA's status quo provisions. It is true, as United argues, that part of the union's concerted action in *American Airlines* involved picketing of the employer airline. However, the union's actions in that case went far beyond mere picketing. The district court found that the union and its members had "engaged in a series of concerted work stoppages and mass demonstrations" against the airline which resulted in flights involving over 1,500 passengers being cancelled or delayed. 57 L.R. R.M. at 2485. Air cargo, air express, and U.S. mail were also delayed as a result of the union activity. *Id.* at 2486. As a consequence of these actions, the district court found that the airline had suffered "a direct loss of revenue" and goodwill, *id.*, and,

accordingly, enjoined the union from engaging in such further pre-strike activity. *Id.* at 2488.

In the present case, unlike *American Airlines*, there was no evidence presented which would indicate that United was harmed by the actions of ALPA during the cooling-off period. Although we do not condone the actions of ALPA in attempting to undermine public confidence in United's ability to continue to provide service, we do not believe that these actions had the consequences of a strike so as to violate the status quo provisions of the RLA. There were no work stoppages or mass demonstrations as a result of these actions; nor has United provided any evidence that it suffered any resulting economic harm. We therefore agree with the district court that ALPA's actions were not unlawful and hence not a bar to injunctive relief.[15]

## III.

The next issue we deal with is ALPA's contention that the district court erred in ruling that United's grant of guaranteed salaries for fleet-qualified replacements [16] was lawful under the RLA. As we noted above, United offered fleet-qualified captains and first officers $75,000 per year and $50,000 per year respectively to serve as permanent strike replacements, guaranteeing the salaries even if the pilots were ultimately demoted to second officers once the strike ended. After the strike was settled, this demotion did in fact take place. The new collective bargaining agreement provided that all striking pilots be returned to their pre-strike positions and, accordingly, all of their replacements were removed

from service and began training as second officers.

ALPA argued in the district court that the replacement program operated as an unlawful sanction against striking pilots, noting that the replacement pilots serving as second officers would be receiving salaries in excess of other second officers under the terms of the new collective bargaining agreement. The district court rejected ALPA's argument noting: (1) that "the pay scales [offered the replacement pilots] were reasonable considering the pilots' experience and qualifications;" (2) that United's use of the replacement program was soundly based since the strike made it necessary for United "to offer a pay scheme sufficient to attract qualified replacements;" and (3) that the hiring of replacements at guaranteed salary levels "does not disadvantage striking pilots...." 614 F.Supp. at 1047. ALPA appeals arguing that United's action both violated its duty to bargain in good faith since United failed to negotiate this issue with the union, *see* 45 U.S.C. § 152, First, and constituted unlawful discriminatory conduct by an employer. *See* 45 U.S.C. § 152, Fourth.

■■■ There is no question that an employer has the right to hire permanent replacements in the event of a strike. *See Empresa Ecuatoriana De Aviacion*, 690 F.2d at 844. *See also NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938) (providing for hiring of permanent strike replacements under the NLRA); *Giddings & Lewis, Inc. v. NLRB*, 675 F.2d 926 (7th Cir.1982); *NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567 (7th Cir.1980). ALPA does not challenge United's right to

---

**15.** In the alternative, the district court ruled, relying on our decision in *International Union, Allied Industrial Workers of America v. Local Union No. 589*, 693 F.2d 666 (7th Cir.1982), that injunctive relief will be barred only where there is a direct nexus between the bad conduct alleged and the act sought to be enjoined. The court, concluding that there was no direct nexus between ALPA's conduct and the rebid procedure, ruled that United had failed to show that the unclean hands doctrine would even be applicable to this case. Because of our resolution of the issue, we do not reach United's argument

that the district court's application of the direct nexus test is neither supported by *International Union* nor otherwise appropriate in this case.

**16.** The term "fleet-qualified replacements" refers to pilots who were, in most instances, flying for other airlines when ALPA's strike against United began. The district court found that when hired these pilots were ready to serve as captains or first officers on the type of jets flown by United.

hire replacement pilots. Nor does ALPA contest United's assertion that the airline could not have secured the necessary captains and first officers needed to continue operations during the strike without the inducement of the guaranteed salaries. What ALPA does challenge is United's purported failure to negotiate the salaries of the replacement pilots with the union prior to hiring. ALPA, relying on *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), contends that, similar to the situation under the NLRA, an employer's unilateral decision to increase wages without prior negotiations constitutes a *per se* violation of the duty to bargain in good faith under the RLA. We find this argument without merit. Even if we were to assume that *Katz* is applicable to cases arising under the RLA, it nonetheless has no relevance to an employer's dealings with potential employees who may be hired to replace striking workers. As we noted in *Capitol-Husting Co. v. NLRB*, 671 F.2d 237, 246 (7th Cir.1982), "[i]t is settled that this duty [to bargain] does not extend to the terms and conditions of employment for replacements of striking employees."

■ Even conceding that it generally has no right to negotiate with respect to salaries paid permanent replacement pilots, ALPA argues that United violated its duty to bargain in good faith by offering salaries to these replacements that were in excess of those offered to union members. *See Local 259, United Automobile, Aerospace and Agricultural Implement Workers of America*, 776 F.2d 23, 28 (2d Cir. 1985); *Burlington Homes, Inc.*, 246 N.L. R.B. 1029, 1030, 1040 (1979) (concluding that employer's offer of a higher starting wage to strike replacements constituted a violation of the NLRA). In essence, ALPA's argument is two-fold. First, that United generally offered the replacement pilots who were ultimately reassigned to second officer status more money than it offered incumbent second officers prior to the strike. ALPA apparently contends that we should consider the hiring of the replacement pilots as simply the employment of additional second officers. It would then follow that United offered its replacement second officers more money than was offered its incumbent second officers, a practice which ALPA contends violated United's duty to bargain in good faith. We find ALPA's argument unpersuasive. At the time that the replacement pilots were hired, they were not hired as second officers, but rather as captains and first officers. Under these circumstances, the proper salary comparison to make is between the replacement captain and first officer salaries and incumbent United captain and first officer salaries. Our review of the record indicates that the salaries paid replacements were less than those offered similarly situated incumbent pilots prior to the strike. On this point, therefore, we need not reach ALPA's contention that United's offers to replacements exceeded offers to incumbent pilots thereby violating the airline's duty to bargain in good faith.

Nor is our analysis affected by the fact that the replacements who were hired as captains and first officers at guaranteed salaries were later reassigned to second officer status. The relevant point of comparison is at the time when United hired the replacement pilots. At that point, the salary offers made to the replacement captains and first officers were less than the proposals made to similarly situated incumbent pilots. ALPA's contention that the replacements were offered more money to serve in similar positions is simply misplaced.

■ The second prong of ALPA's argument is that the proper point of reference with respect to the replacement pilots' salaries is the new-hire pay scale proposed by United as opposed to the salaries United was offering its incumbent pilots. ALPA is correct in noting that in most instances the salaries proposed by United for new hires were less than those offered the replacement pilots. However, this is irrelevant for purposes of the present case. The cases ALPA cites involve situations in which incumbent employees were offered

less money than was ultimately paid to permanent strike replacements. In the present case, conversely, the replacement pilots were paid less than the salaries offered incumbent captains and first officers. ALPA is unable to cite any case in which a court held that an employer violated its duty to bargain by offering replacements salaries in excess of those proposed for persons to be hired in the future as opposed to incumbent employees. In such a case, we do not believe an employer violates its bargaining duty and, accordingly, hold that United acted lawfully in hiring its replacement pilots at the guaranteed salaries.

■ Apart from violating United's duty to bargain in good faith, ALPA also contends that the hiring of replacement pilots at guaranteed salary levels unlawfully discriminated against the striking pilots. ALPA argues that the only lawful inducement that could be offered replacement pilots was an offer of permanent employment. Any other type of inducement, such as the guaranteed salaries offered here, would, according to ALPA, have destructive effects on the union membership once the strike ended. We disagree. Although we believe that United's policy of super-seniority (*i.e.*, the rebid) was unlawful, the guaranteed salaries involved here are of a different nature. ALPA attempts to sidestep this difference by arguing that the logic of the Supreme Court's decision in *Erie Resistor, supra*, regarding super-seniority applies equally as well to the guaranteed salaries. However, even the Supreme Court has noted the limited applicability of that case. *See Belknap*, 463 U.S. at 505 n. 8, 103 S.Ct. at 3180 n. 8 (noting that *Erie Resistor* "involved an offer of super-seniority to replacements" and that "[t]he opinion was careful to distinguish cases not involving that element").

Moreover, as the district court observed, the striking pilots will not suffer the discriminatory harm as a result of our upholding of the guaranteed salaries that they would be subjected to by implementation of the rebid. Under the new agreement, the striking pilots returned to the same positions at the same salaries they had prior to the strike. Our conclusion that the guaranteed salaries are lawful will have no effect on this situation. On the other hand, if the rebid program were implemented, each striking pilot would potentially be subject to losing his position to a less senior nonstriking pilot. In other words, the guaranteed salaries to replacement pilots do not discriminate against the striking pilots as would the rebid super-seniority procedure. Indeed, unlike the rebid, the guaranteed salaries will have the same effect on nonstriking United pilots as they do on striking pilots. Nonstriking pilots who crossed the picket line, as opposed to replacements hired during the strike, will neither gain nor lose as a result of the guaranteed salaries. ALPA's argument that the guaranteed salaries discriminate solely against striking pilots is, therefore, misplaced.

In addition, the district court found that the guaranteed salaries, as opposed to the rebid, were necessary to keep United running. If we were to hold that United was not able to take the necessary steps to keep its operations going through a strike, we would, in effect, eviscerate its lawful right to self-help. Under the RLA, an employer has the right to maintain its operation even if this means hiring replacements for striking workers. In this case United acted responsibly in hiring replacements at guaranteed salaries which the district court considered reasonable under the circumstances. In light of United's right to self-help, we will not disturb that action.

■ Finally, we also reject ALPA's argument that the guaranteed salaries were superseded by the new collective bargaining agreement between the union and United. Relying on *Brotherhood of Railway & Steamship Clerks v. Florida East Coast Railway, supra*, ALPA argues that the guaranteed salaries could only lawfully be in effect during the temporary duration of the strike. In that case, the Supreme Court ruled that an employer's power during a strike "to make new terms and conditions governing the new labor force is

strictly confined." 384 U.S. at 247, 86 S.Ct. at 1425. As we noted before, however, the collective bargaining agreement in *Florida East Coast* remained in effect during the strike. ALPA's reliance on this decision in a case in which the collective bargaining agreement had already expired prior to the strike is therefore tenuous. More directly on point is the Supreme Court's decision in *Belknap, Inc. v. Hale, supra.* In *Belknap,* the Court held that permanent replacements are not preempted by federal law from suing their employer to enforce the employer's promise of employment. The Court noted that if an employer decides to exercise its right to hire permanent replacements, "it surely does not follow that the employer's otherwise valid promises of permanent employment are nullified by federal law...." 463 U.S. at 500, 103 S.Ct. at 3177. Similarly, in the present case we conclude that the district court did not err in ruling that the RLA was not a bar to United's fulfillment of its promise to the replacement pilots.

### IV.

The final issue we reach regards the status of the Group of 500. The district court ruled that the Group of 500 became United employees on May 17, the day the strike began, and that thereafter United's treatment of these pilots violated section 2, Fourth of the RLA, 45 U.S.C. § 152, Fourth. Under section 2, Fourth, a carrier is prohibited from, among other things, denying or questioning "the right of its *employees* to join, organize, or assist in organizing the labor organization of their choice ... or to influence or coerce *employees* in an effort to induce them to join or remain or not to join or remain members of any labor organization." (emphasis added). United appeals arguing, *inter alia,* that the Group of 500 were never employees and hence not afforded protection under section 2, Fourth.

In reviewing the district court's decision with respect to the Group of 500, ALPA contends that we must apply the "clearly erroneous" standard specified in Fed.R.

Civ.P. 52 since the question of whether these pilots are employees is a factual one. To support its position, ALPA cites the recent Supreme Court decision in *Icicle Seafoods, Inc. v. Worthington,* —— U.S. ——, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). In *Icicle,* the Court considered the proper standard of review applicable in examining a district court's finding that the respondents were "seamen" for purposes of the Fair Labor Standards Act. On appeal from the lower court's ruling, the Ninth Circuit, applying a *de novo* standard of review, engaged in its own factfinding and concluded that the respondents were in fact not seamen. In reversing this decision, the Supreme Court noted:

> If the Court of Appeals believed that the District Court had failed to make findings of fact essential to a proper resolution of the legal question, it should have remanded to the District Court to make those findings. If it was of the view that the findings of the District Court were "clearly erroneous" within the meaning of Rule 52(a), it could have set them aside on that basis. If it believed that the District Court's factual findings were unassailable, but that the proper rule of law was misapplied to those findings, it could have reversed the District Court's judgment. But it should not simply have made factual findings on its own.

106 S.Ct. at 1530.

ALPA argues that similar to *Icicle* the district court's finding that the Group of 500 are United employees is a finding of fact and hence is reviewable only under the clearly erroneous standard. We find this contention without merit. There is no dispute regarding the factual findings made by the district court surrounding the Group of 500; rather, the issue is whether, given these facts, the court properly applied the RLA to conclude that the Group of 500 were United employees as of May 17. In other words, it is not simply a question of "applying a legal standard to a descriptive or historical narrative," *Mucha v. King,* 792 F.2d 602, 605 (7th Cir.1986), but rather a question of whether the proper legal

standard was applied. Accordingly, we review *de novo* the district court's conclusions with respect to the employee status of the Group of 500.

In concluding that the Group of 500 were employed by United, the district court did recognize that the RLA specifically defines the term "employee." Under the Act an employee "includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission...." 45 U.S.C. § 151, Fifth. *See* 45 U.S.C. § 181 (providing that 45 U.S.C. § 151 extends to "every air pilot or other person *who performs any work as an employee* or subordinate official of such carrier or carriers, *subject to its or their continuing authority to supervise and direct the manner of rendition of his service"*) (emphasis added). *See also* 45 U.S.C. § 182 (applying definition of 45 U.S.C. § 151, Fifth to the airline industry "as though such carriers and their employees were specifically included within the definition of 'carrier' and 'employee' respectively, in section 151 of this title"). Nonetheless, the court found that the Group of 500 became employees on May 17. To reach this result the trial judge, relying on *Pennsylvania Railroad v. Day*, 360 U.S. 548, 79 S.Ct. 1322, 3 L.Ed.2d 1422 (1959), and *Air Line Pilots Association v. Alaska Airlines, Inc.*, 735 F.2d 328 (9th Cir.1984), stated that the definition of "employee" under the RLA is not to be interpreted narrowly.

Even construing the term "employee" broadly under the RLA, however, the district court refused to find that the Group of 500 were employees during their training period. ALPA does not contest this conclusion. The trial judge did nonetheless find that all members of the Group of 500 had accepted employment with United on May 17 and that as such they became employees on that date even though they refused to report to work. To support its position that "[p]hysically reporting to work to establish an employer-employee relationship is not a prerequisite to the right to strike on the first day of employment," 614 F.Supp. at 1042, the court relied on *NLRB v. New England Tank Industries, Inc.*, 302 F.2d 273 (1st Cir.), *cert. denied*, 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962). In that case, the First Circuit ruled that an employer's refusal to hire former employees of its predecessor because of the employees' union activities violated the NLRA. Additionally, the court found that three union members who were offered jobs but refused to report because of the employer's anti-union actions were unfair labor practice strikers who were entitled to employment at the conclusion of the strike. The employer argued that these men, since they had never worked for it, were not employees and hence had no right to strike. The court disagreed noting that even though the men had "never actually reported to work" they would have "but for the company's illicit policies and acts...." *New England Tank*, 302 F.2d at 277. In the instant case, the district court concluded, as had the court in *New England Tank*, *id.* at 278, that requiring persons who were offered jobs to report to work before they could be considered employees would be a meaningless exercise.

■ After reviewing the statutory definition of employee under the RLA, we are, however, forced to conclude that the district court erred in ruling that the members of the Group of 500 became United employees on May 17.[17] These pilots never performed any work for United nor did they ever submit to United's supervision of them in their work. By its own terms, the definition of employee under the RLA would exclude our giving the Group of 500 employee status. *See Consumer Product Safety Commission v. GTE Sylvania,*

---

**17.** Because we conclude that the Group of 500 were not "employees" entitled to protection under section 2, Fourth of the RLA, we have no need to reach United's argument that section 2, Fourth is limited solely to the regulation of union organization.

*Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (noting that "[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive"); *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962) (in general a statute's "legislative purpose is expressed by the ordinary meaning of the words used").

Furthermore, we disagree with the district court's conclusion that both *Day, supra,* and *Alaska Airlines, supra,* support a broad reading of the RLA's definition of employee. In *Day,* the Supreme Court held that jurisdiction of the National Railroad Adjustment Board under the RLA would extend to cover a pay dispute involving an employee who had subsequently retired. The Court ruled that the provisions of the RLA would still apply in a case where "the employee has retired from service after initiating a claim for compensation for work performed while on active duty," 360 U.S. at 551, 79 S.Ct. at 1324, noting that "[t]here is nothing in the Act which requires that the employment relationship subsist throughout the entire process of administrative settlement." *Id.* at 551–52, 79 S.Ct. at 1324. Similarly, in *Alaska Airlines,* the Ninth Circuit held that a retired pilot was entitled to file a grievance under the RLA regarding calculation of his retirement benefits. The court held that the grievance, like the dispute in *Day,* arose within the employer-employee relationship and could therefore be adjudicated under the Act. 735 F.2d at 328–29.

The Supreme Court in *Day* and the Ninth Circuit in *Alaska Airlines* considered disputes which arose out of the employer-employee relationship. In both cases former employees raised claims regarding either incidents that occurred or benefits that accrued while they had been employed and

subject to the protections of the RLA. It unduly stretches the logic of these decisions to apply them to the instant case. The members of the Group of 500 are not seeking to resolve issues which arose during their employment nor are they concerned about benefits which accrued during that period. Rather, they are simply trying to interpret the RLA broadly so that they will be deemed employees even though they never began working for their alleged employer. Neither *Day* nor *Alaska Airlines* support such a conclusion.

Indeed, in a similar case the National Mediation Board [18] ruled that persons in a position like the members of the Group of 500 would not be considered employees for purposes of the RLA. In *In re Union of Flight Attendants (Air Micronesia),* 10 N.M.B. 11 (1982), the NMB ruled that a group of trainees were not employees under the RLA and were therefore ineligible to vote in representation elections. In rejecting the argument that these people should be considered employees since they had completed their training and had expectations of employment, the NMB noted:

> [T]he three subject individuals have never been on the carrier's payroll as working employees. At best, they have the mere hope of an offer if an opening arises at some time in the future....
>
> Clearly, a person who has been trained in the hope of a future job offer, but who is free in the interim to seek any other employment, and whose present availability is unknown, is not a person subject to the carrier's "authority to supervise and direct the manner of rendition" of service.

*Id.* at 14 (quoting 45 U.S.C. § 181). *Cf. Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947) (ruling that trainees are not employees under the Fair Labor Standards Act's defini-

---

**18.** The NMB is the administrative body that determines which persons are eligible to participate in representation elections under the RLA. 45 U.S.C. § 152, Ninth. It is well-established that the NMB's interpretation of those provisions of the RLA over which it has responsibility is entitled to deference. *See Switchmen's*

*Union v. National Mediation Board,* 320 U.S. 297, 299–301, 303–04, 64 S.Ct. 95, 96–97, 98–99, 88 L.Ed. 61 (1943); *Chicago Truck Drivers Union, Helpers & Warehouse Workers v. National Mediation Board,* 670 F.2d 665, 670 (7th Cir. 1981).

tion which provides, pursuant to 29 U.S.C. § 203(e)(1) (Supp. III 1985), that an employee is "any individual employed by an employer"); *Donovan v. American Airlines, Inc.*, 686 F.2d 267, 272 (5th Cir.1982) (trainees for certain positions were not employees under FLSA where they were never on the payroll, and never displaced, substituted for, or supplemented regular airline employees during their training).

A similar conclusion was reached by the court in *Nelson v. Piedmont Aviation, Inc.*, 750 F.2d 1234 (4th Cir.1984), *cert. denied*, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985). In that case, the court ruled that an applicant for a job is not an employee under the RLA and that therefore the plaintiff applicant had no cause of action under the Act. Relying on the specific language of the RLA defining the term employee, the court stated:

> Here the statutory language does not admit of doubt. At the time of his application to Piedmont, [the applicant] was not "in the service of a carrier" and did not "perform any work" for an airline as specified by 45 U.S.C. § 151 Fifth. Therefore, [the applicant] was plainly not subject to the protections of 45 U.S.C. § 152 Fourth, prohibiting an employer from interfering with an employee's free choice of whether or not to join a labor organization.

*Id.* 105 S.Ct. at 1236. *See International Longshoremen's Association, AFL–CIO v. North Carolina State Ports Authority*, 370 F.Supp. 33, 40 (E.D.N.C.1974) (noting that "the employees must be in the service of a carrier and the work performed by the employees must bear a direct relationship to the transportation activities of the ... carrier"), *aff'd*, 511 F.2d 1007 (4th Cir.1975) (per curiam). We agree with the NMB and the Fourth Circuit that trainees and applicants simply do not fall within the RLA's definition of employee. Accordingly, we hold that the district court erred, as a matter of law, in concluding that the Group of 500 were United employees as of May 17.

▮ We recognize that although *New England Tank, supra,* may at first glance seem to support the district court's conclusion, in the end we believe that the court's reliance on that case is misplaced. We do not believe that the holding under the NLRA in *New England Tank* which provided that a person may become an employee without reporting to work because of a strike is applicable to the RLA. It would be in direct contravention of the RLA's definition of employee to conclude that a person may become an employee even though he never performed any work for the employer and was never under that employer's direct supervision. We must begin with the plain and ordinary meaning of the words in construing a statute and regard that language as conclusive absent a clearly expressed legislative intent to the contrary. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). ALPA has provided no convincing evidence that Congress did not intend that the RLA's definition of employee meant what it said. We therefore conclude that unless a person has performed services for the employer under that employer's supervision he is not an employee for purposes of the RLA.[19]

---

**19.** ALPA argues that because the Group of 500 accepted offers of employment from United that, under common law, they were not required to report to work to be considered employees for purposes of the RLA. We disagree. The definition of employee under the Act makes it clear that a person must perform work for his employer under that employer's supervision to be deemed an employee. Members of the Group of 500 failed to perform any services for United and were hence never employees of the airline. *See Walling v. Portland Terminal Co.*, 330 U.S. 148, 150, 67 S.Ct. 639, 640, 91 L.Ed. 809 (noting that "in determining who are 'employees' under [the FLSA], common law employee

categories or employer-employee classifications under other statutes are not of controlling significance").

ALPA's reliance on *Nashville, C. & St. L. Ry. v. Railway Employees' Dep't of Am. Fed'n of Labor*, 93 F.2d 340 (6th Cir.1937), *cert. denied*, 303 U.S. 649, 58 S.Ct. 746, 82 L.Ed. 1110 (1938), is inapposite. The issue in *Nashville* was whether a person who had performed services for his employer in the past but was now on temporary furlough should be considered an employee under the RLA. The court held that furloughed employees who retained their seniority rights entitling them to preference in reinstatement

Even conceding that the members of the Group of 500 were not employees under the RLA, ALPA argues that we should uphold the district court's alternative ruling that United violated section 2, Fifth of the Act, 45 U.S.C. § 152, Fifth. Section 2, Fifth provides in pertinent part that

> [n]o carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization. . . .

The district court held that

> [b]y making employment contingent on crossing the picket line, United has violated Section 2, Fifth by requiring "persons" not to join the union or its activities. United was clearly aware that requiring the student pilots to cross a lawful picket line would disqualify them from future union membership.

614 F.Supp. at 1043–44. In so ruling, the court relied on cases interpreting section 8(a)(3) of the NLRA which makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

■ We agree with the district court that section 2, Fifth of the RLA is applicable to members of the Group of 500. As opposed to other provisions of the Act which extend solely to "employees," section 2, Fifth applies to "persons." Accordingly, drawing on the ordinary meaning of the statute, we can conclude that the term persons encompasses more than the term employees so that applicants for employment and the like are afforded protection against employer coercion regarding the signing of agreements to join or not join a labor organization. We also recognize that, as the district court asserted, section 8(a)(3) of the NLRA provides protection to

employees or prospective employees from a broad range of anti-union discrimination. In *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), for example, the Supreme Court rejected the proposition distinguishing between discrimination in hiring and terminating employment under the NLRA. In so doing the Court noted:

> Discrimination against union labor in the hiring of men is a dam to self-organization at the source of supply. The effect of such discrimination is not confined to the actual denial of employment; it inevitably operates against the whole idea of the legitimacy of organization.

*Id.* at 185, 61 S.Ct. at 848.

■ We must part company with the district court, however, regarding its conclusion that the RLA embodies the same policies as does the NLRA with respect to employer coercion and that therefore section 2, Fifth must be read broadly to bar an employer from conditioning employment on a person's reporting to the first day of work during a union strike. We recognize that a court has a certain degree of latitude in interpreting statutes to ensure that the congressional purpose is effected. This latitude does not, however, empower a court to override the plain meaning of a statutory provision in order to effect, by judicial fiat, the purpose it chooses to give the legislation. In the present case, section 2, Fifth provides only that an employer not require a person to sign a contract or agreement either promising to or not to join a union. This statutory language is a far cry from section 8(a)(3) of the NLRA which prohibits, among other things, anti-union discrimination with respect to hiring decisions or conditions of employment. Whereas section 8(a)(3) provides a union protection from a broad range of discriminatory attacks, section 2, Fifth specifically defines those acts which are unlawful.

were employees under the Act. Indeed, the court noted that the furloughed employees were all back at work by the time the case was tried below. *Id.* at 343. The difference between the situation in *Nashville* and the present case is evident. Whereas the workers in *Nashville* had

performed services for their employer and were only on temporary furlough, the members of the Group of 500 had never worked for United. Our holding that the Group of 500 are not employees is, therefore, consistent with the Sixth Circuit's ruling in *Nashville.*

■ ALPA fails to cite any case or legislative history which would support giving section 2, Fifth the broad reading it advocates. ALPA does rely on section 2, Fourth of the RLA to argue that Congress intended to give broad protections from employer coercion. What ALPA conveniently ignores, however, is the fact that section 2, Fourth is applicable solely to "employees" and not merely to any "person" as is section 2, Fifth. The language of section 2, Fifth is clear and we refuse to give it a gloss, in the absence of a clearly expressed intent of Congress, that the language cannot reasonably support. If Congress had wanted section 2, Fifth to apply as broadly as section 8(a)(3) it would never have drafted the statutory language of the former provision so narrowly. There is no evidence in the instant case showing that United required members of the Group of 500 to sign agreements not to join ALPA as a condition of their employment. Accordingly, we hold that the district court erred in ruling that United violated section 2, Fifth. *See Nelson v. Piedmont Aviation, Inc.,* 750 F.2d at 1236 (ruling that section 2, Fifth was inapplicable since the "appellant [made] no claim that [the employer] attempted to extract any promises from him in violation of this provision").

ALPA contends that this view of section 2, Fifth undercuts Congress's purpose in enacting the provision. We agree with the union that section 2, Fifth, along with section 2, Third and Fourth, serve to advance the maintenance of effective labor organizations. *See International Association of Machinists v. Street,* 367 U.S. 740, 759, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961). However, we cannot accept ALPA's argument that, in essence, section 2, Fifth incorporates the protections afforded by section 2, Third and Fourth. We do not believe

that limiting section 2, Fifth to its express language undercuts the congressional intent of providing protection to persons from employer coercion. By its own terms, section 2, Fifth shields persons from being coerced into joining or not joining a union prior to employment. Once these persons become employees they will receive all of the protections necessary to ensure that their union will remain a viable representative of their interests. Under these circumstances, we see no need to expand section 2, Fifth to the dimensions ALPA advocates.[20]

■ Finally, in the alternative, the district court held that United violated section 2, Seventh of the RLA by unilaterally altering the status quo in its institution of the "'nonemployee' training program for the Group of 500." 614 F.Supp. at 1043. The court, relying on *Detroit & Toledo Shore Line Railroad, supra,* ruled that although there was nothing in the collective bargaining agreement between United and ALPA governing training of future pilots, such issues are nonetheless assumed to be part of the agreement and subject to the status quo provisions of the RLA.

> Section 2, Seventh provides that
> [n]o carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, *as embodied in agreements* except in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 152, Seventh (emphasis added). This provision is not the only section of the RLA which requires that the status quo be maintained, however. In *Detroit & Toledo Shore Line Railroad,* the Supreme Court reviewed the status quo that is mandated by sections 5, 6, and 10 of the RLA, 45 U.S.C. §§ 155, 156, 160. These sections,

---

**20.** We also reject ALPA's argument that United's requirement that the Group of 500 cross the picket line to become employees was in essence an agreement not to join a union. We recognize that under ALPA's constitution it is unlikely that the pilots who crossed the picket line will ever become union members. Nonetheless, United should not be held responsible for violating the RLA simply because ALPA seeks to discipline its members. Indeed, were United found to have violated section 2, Fifth each time it induced someone to cross the picket line, it would have been unable to exercise its right to replace striking employees. Since the right to hire permanent replacements is a recognized self-help measure, ALPA's argument undercutting that right must be rejected.

among other things, outline the procedures that must be followed when either party to an agreement seeks a contract modification. In *Detroit & Toledo Shore Line Railroad,* the Court rejected an argument by the employer that the status quo provisions of sections 5, 6, and 10 of the RLA apply solely to terms that are specifically enumerated in the collective bargaining agreement. In so doing, the Court noted:

> We have stressed that the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement.

396 U.S. at 153, 90 S.Ct. at 301.

In the instant case it is unchallenged that the relevant collective bargaining agreement made no mention of United's pilot training practices and procedures. ALPA argues that *Detroit & Toledo* requires that established procedures be deemed to be part of the collective bargaining agreement. For its part, United contends that ALPA's reliance on *Detroit & Toledo* is simply irrelevant in interpreting section 2, Seventh. United notes that the Court in *Detroit & Toledo* relied on sections 5, 6, and 10 of the RLA and specifically stated that section 2, Seventh was not part of its analysis. *See* 396 U.S. at 155–56, 90 S.Ct. at 302–03.

At first glance, United's argument appears to have some merit. Section 2, Seventh requires that the status quo be maintained only with respect to those terms "embodied" in the agreement whereas the status quo provisions of sections 5, 6, and 10 are not specifically limited to the express terms of the agreement. *See* 45 U.S.C. § 155, First (b) (requiring that for thirty days after one party refuses arbitration, unless arbitration is subsequently agreed to or an emergency board is created, "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose"); 45 U.S.C. § 156 (requiring that parties give notice of desired change in agreement and "[i]n every case where such notice of intended change

has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board"); 45 U.S.C. § 160 (providing that after the creation of an emergency board "and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose").

Although United's argument that section 2, Seventh deals solely with terms and conditions expressly stated in the agreement is plausible, we need not reach that issue. By its own terms, section 2, Seventh serves to protect the status quo of "rates of pay, rules, or working conditions of ... *employees....*" 45 U.S.C. § 152, Seventh (emphasis added). As we noted above, however, the members of the Group of 500 were never employees. Moreover, the change in training practices did not impact upon then current United employees. In short, the district court's reliance on section 2, Seventh is inapposite.

ALPA apparently concedes the inapplicability of section 2, Seventh since in its brief it relies solely on the status quo provisions of section 6. United's argument that we are limited to protecting the status quo with respect to express contractual terms then becomes irrelevant because under section 6 United's established training practices are arguably part and parcel of the collective bargaining agreement pursuant to *Detroit & Toledo Shore Line Railroad, supra.* Section 6 requires maintenance of the status quo with respect to rates of pay, rules, and working conditions. As the Court in *Detroit & Toledo* noted, section 6 extends only to "those actual, objective

working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in and related to that dispute." 396 U.S. at 153, 90 S.Ct. at 301 (footnote omitted). It goes without saying that "working conditions" serve to affect only employees included within the bargaining unit. United argues, therefore, that in the present case section 6 extends solely to its statutory employees and not to the Group of 500. *Compare* 45 U.S.C. § 152, First (placing duty to reach and maintain agreements on employer and employee only) *with Detroit & Toledo*, 396 U.S. at 151–52, 90 S.Ct. at 299–300 (acknowledging that the status quo provisions of the RLA must be read in conjunction with the implicit status quo requirement under section 2, First). We agree. The members of the Group of 500 are, accordingly, ineligible for relief under this provision.

Our analysis cannot end here, however, because United's treatment of the Group of 500, if it affected the pay rates, rules, or working conditions of pilots already in United's employ, could nonetheless be potentially violative of section 6. In *International Brotherhood of Teamsters v. World Airways, Inc.*, 111 L.R.R.M. (BNA) 2170 (N.D.Cal. Aug. 20, 1982), for example, the court refused to grant injunctive relief on grounds that section 6 was not violated by the airline's institution of a training program to prepare additional crews for use in a potential work stoppage. The court rejected the union's section 6 argument stating that such a "program is not a status quo violation so long as it is separated from the continuing operations of the Company." *Id.* at 2172. The union's request for injunctive relief was denied since it "failed to sustain its burden of showing any substantial current effect on operations." *Id. See Illinois Central Railroad v. Brotherhood of Locomotive Engineers*, 422 F.2d 593, 595–96 (7th Cir.1970) (training program was violation of status quo

where it interfered with current operations). We agree with the district court in *World Airways* that unless some effect of a change is shown on the rate of pay, rules, or working conditions involving employees no section 6 violation has occurred. In the instant case, ALPA has failed to make such a showing and, accordingly, we hold that the district court erred in ruling that United had violated the status quo mandated by section 6.

Our conclusion is not undermined by ALPA's argument that if United was not required to bargain regarding the Group of 500, the union should not have been required to bargain regarding the new-hire pay scales which would only affect future employees. A union is required to bargain over the terms and conditions of employment that will be in place when future employees take their positions. This is not at all analogous to a duty to bargain with respect to terms and conditions imposed upon trainees who are not employees and who may never become employees.[21] ALPA's argument to the contrary is simply misplaced.

### V.

For the reasons stated above, we affirm the decision of the district court with respect to the rebid procedure and the hiring of replacement pilots at guaranteed salary levels. We reverse the district court's holding with respect to the Group of 500.

AFFIRMED IN PART AND REVERSED IN PART.

---

**21.** Contrary to ALPA's contention, our holding does not limit the union's ability to bargain with respect to the wages and conditions of employment that future employees will face. We only

hold that United did not violate section 6 when it made changes in the terms and conditions of training as they apply to non-employees.